James Cletus BRANDON

v.

YALE & TOWNE MANUFACTURING CO.

Civ. A. No. 26585.

United States District Court
E. D. Pennsylvania.

Aug. 7, 1963.

Supplemental Opinion Sept. 5, 1963.

856

Davis, Bellis & Kolsby, by Herbert F. Kolsby and Alfred Sarowitz, Philadelphia, Pa., for plaintiff.

Swartz, Campbell & Henry, by Lynn L. Detweiler, Philadelphia, Pa., for defendant.

WOOD, District Judge.

The plaintiff was injured when he was struck by falling corrugated cardboard which was stacked 15 feet high in the corrugating room of the Industrial Container Corporation where he was employed as a fork lift operator. The defendant is the manufacturer and supplier of the fork lift truck used by the plaintiff in the stacking operation of the Industrial Container Corporation (Industrial). This fork lift truck, known as a 90″ truck, had a lifting capacity of 144″ in the air. It did not come equipped with an overhead canopy guard or load back rest which are safety devices intended to protect the operator against falling objects while he is in the driver's seat. An overhead canopy guard is a frame of two curved steel tubes and cross members at right angles thereto, placed over the middle portion of the fork lift truck, and a load back rest is a steel framework, resembling the headboard of an old-fashioned brass bed, placed at the rear of the extension mast, to prevent loads supported by the forks of the truck from falling back.

The stacking was done on wooden pallets by means of the fork lift trucks to a height of 17 to 18 feet in the "A" room where this accident occurred. First, the cardboard was placed by hand on each pallet, loosely, to a height of five to six feet. Then the fork lift truck operator inserts its blades into the pallet and raises the pallet to the required height and deposits the load and lowers the forks.

The plaintiff had already stacked two loads of corrugated board in Room "A" to a height of ten feet. He picked up the third load, raised it and tilted the blade back and drove over to the first two stacks, then stopped in front of these, levelled the blades, raised this stack over the top of the first two stacks and then drove forward and lowered the stack. The forks were 11 to 12 feet in the air at the moment when he started to lower the forks. He had already lowered them about an inch when some of the corrugated boards started to fall backward upon him. At that time the wheels of the truck were stopped on the level floor and the mast was upright and not tilted backward. It had to be upright in order that it be set on the stacks already in place. All of the corrugated boards were in position for stacking.

When the load began to fall, plaintiff tried to protect himself and grabbed the steering wheel in an effort to get off.

He was struck by some of the boards on the back of the neck and rendered a quadriplegic by the injury.

The plaintiff contends that Yale and Towne Manufacturing Co. (Y. & T.) was negligent in supplying this fork lift truck without the appropriate safety devices designed to prevent just the type of accident which befell him. Y. & T. argues that it notified Industrial that this truck was dangerous to use in the high stacking areas of its plant without these safety devices and that it was not required to go further, and warn each individual operator of this truck.

The jury returned a verdict for the plaintiff and now Y. & T. seeks a judgment n. o. v. under F.R.Civ.P. 50(b).

Y. & T.'s motion for judgment n. o. v. was not preserved as required by Rule 50 [1] and for that reason must be denied. Massaro v. United States Lines Company, 307 F.2d 299 (3 Cir., 1962); Godwin v. Brown, 249 F.2d 356, 363 (8 Cir., 1957), and most recently in this District, Provident Tradesmens Bank and Trust Company, Adm'r. et al. v. Lumbermens Mutual Casualty Company et al., D.C., 218 F.Supp. 802.

Rule 50(b) plainly requires that a motion for a directed verdict *at the close of all the evidence* is a prerequisite of a motion for judgment n. o. v. Massaro v. United States Lines Company, supra 307 F.2d at p. 303; Eisenberg v. Smith, 263 F.2d 827, 829 (3 Cir., 1959).

 At the close of the plaintiff's evidence the defendant moved for a directed verdict under Rule 50(a). However, since no motion for a directed verdict was made *at the close of all the evidence*, it was waived and abandoned by the defendant's failure to renew the motion at the close of Y. & T.'s case. Budge Manufacturing Co. v. United States, 280 F.2d 414, 416 (3 Cir., 1960). We cannot accord to the defendant's point for charge number (1):

"Under all the evidence in this case your verdict must be in favor of the defendant,"

the effect of a motion for a directed verdict. Such a request is unspecific in its terms and does not meet the requirements of Rule 50(a), Massaro v. United States Lines Company, supra 307 F.2d at p. 303. The motion for judgment n. o. v. is equally unspecific and deficient in its content.

In addition to this formidable procedural obstacle, there is sufficient evidence with all the reasonable inferences therefrom, taken most favorably to the plaintiff, to uphold this verdict.

Simply stated, the defendant argues that it is insulated from liability by the fact that Y. & T. apprised Industrial of the danger involved in using this particular fork lift truck in the high stacking operation without the overhead canopy and back rest being attached. It is further argued that Y. & T. had no duty to advise each individual operator of this danger. It was uncontroverted at the trial that this fork lift truck was dangerous to use in the high stacking of corrugated board without the safety devices.

1. Rule 50 provides in the material part as follows:

"*Rule 50. Motion for a Directed Verdict and for Judgment Notwithstanding the Verdict.*

"(a) When Made: Effect. A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted * * *.

* * * * *

*A motion for directed verdict shall state* the specific grounds therefor. (Emphasis added)

"(b) *Motion for Judgment Notwithstanding the Verdict. Whenever a motion for a directed verdict made at the close of all the evidence is denied* or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict * * *." (Emphasis supplied)

This was so, not only in the opinion of expert safety engineers (n. t. 98–99, 178–179), but also by virtue of the American Standards Association Code for the Operation of Industrial Power Trucks (A.S.A. Code B561–1955), published in 1955, and representing the applicable accepted minimum safety standard in the materials handling industry during the period in issue. (n. t. 158–159).

The material provisions of this Code had been recommended by the Subcommittee on Industrial Power Trucks of A.S.A., under the chairmanship of C. S. Schroeder, Director of Research, Research Division Yale & Towne Mfg. Co., the defendant, representing the Electrical Industrial Truck Assn. (n. t. 159–160).[2]

At the argument on this motion it was conceded by the defendant that there was no issue regarding any contributory negligence on the part of Brandon. On the day of this accident he worked a double shift beginning at 3 p. m. and continuing until 6 a. m. the following morning when this accident happened. He was stacking his corrugated board pursuant to the direct order of his employer to get this work completed because Industrial was operating at top production on a round-the-clock basis to fill orders.

This increased business in 1958 precipitated the sale of this truck along with two other fork lift vehicles to Industrial by Y. & T. In January of 1958 Industrial invited James K. Redding (Redding), a sales engineer with Y. & T. to discuss Industrial's need for adequate material-handling equipment (n. t. 11–13).

Redding discussed the nature of Industrial's problem with Albert L. Patterson, a vice-president in charge of production. Redding made many visits to the plant and examined every area, measured all the heights and distances involved and observed the sizes and weights and natures of the loads that were being picked up, carried and stored, so that he was thoroughly familiar with Industrial's needs.

As a result of these discussions, it was agreed that three fork lift trucks equipped with load back rests and overhead canopy guards were to be supplied. Y. & T. proposed in writing (Ex. P–1, dated August 15, 1958) the purchase of two new 90-inch fork lift trucks having 144 inches of lift and one 83-inch fork lift truck having 130 inches of lift, all equipped, inter alia, with overhead canopy guards and load back rests. All of these trucks were needed for high stacking (n. t. 202).

This re-examination of the record clearly illustrates that the main reason these trucks were bought by Industrial was to combat their compelling need for high stacking equipment. Whatever else these trucks might have been utilized for was incidental to their primary stacking function.

When the trucks were delivered to Industrial one 90-inch truck, the vehicle involved in this accident, was not equipped with the canopy and back rest. This

---

2. Section 4 of this Code specifically provides that "shall," as stated therein, is to be understood as mandatory, and "should" is to be understood as advisory (n. t. 161–162).

Section 603 provides that:

"*Wherever fork truck operation exposes the operator to danger from falling objects, the truck shall be equipped with a canopy guard*. The guard shall be of sufficient strength to support a capacity load and have no opening larger than the smallest parcel carried.

"*Exceptions:* Where the overall height of the truck with forks in lowered position is limited by headroom conditions and there is insufficient space for the operator to assume a normal driving position, such canopy guards may be omitted." (n. t. 161) (Emphasis supplied)

Section 604 provides that:

"Back Guards for forks:" "*Fork trucks which handle small objects or unstable loads shall be equipped with a vertical back rest or back guard* which shall have height, width and strength sufficient to prevent any part of the load from falling toward the truck when the mast is in a position of maximum backward tilt, and shall have no opening greater than the smallest parcel carried." (n. t. 163–164) (Emphasis supplied)

vehicle was known as a "loaner" and Patterson called Redding about the absence of the safety devices and he was informed that they were unavailable, but that they would be supplied as soon as possible. The truck was accepted because it was badly needed by Industrial.

 There was a conflict between the testimony of Mr. Patterson (n. t. 20–21) and the testimony of Mr. Redding (n. t. 209) as to whether this truck was to be delivered without the safety equipment. Also, there was a conflict between the testimony of Patterson and Redding (n. t. 22, 210, 211, 212) and the testimony of W. L. Lawrence, night superintendent of Industrial (n. t. 95–100) as to whether or not specific instructions were given restricting the use of this truck to areas of the plant not used for high stacking. This conflict was reasonably resolved by the jury and it is beyond our province to substitute our opinion for their considered deliberation. Sentilles v. Inter-Carribbean Shipping Corp., 361 U.S. 107, 110, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959).

██ In light of the discussions between Redding and Patterson as well as the proposal which became the integration of these discussions it became a jury question as to whether it was reasonably foreseeable that a fork lift truck manufactured to stack cardboard to a height in excess of 15 feet would be used for such a purpose by the lessee. Also, it was for the jury to balance the *urgent* need of Industrial for this high stacking equipment against any testimony elicited concerning any restrictions imposed on its use throughout the plant. Conowingo Power Co. v. State of Maryland, 120 F.2d 870, 875 (4 Cir., 1941) in which the Court said:

"* * * Nor are we impressed with the argument that the negligence of defendant could not be deemed the proximate cause of the injury because no such action as that which resulted in decedent's death could reasonably have been foreseen by defendant. * * * 'If * * * the injury follows as a direct consequence of a negligent act or omission, it cannot be said that the company is not responsible therefor because the particular injury could not have been anticipated.' 18 Am.Jur. 449 and cases cited."

 The absence of these safety appliances was the proximate cause of the injury to the plaintiff, since if they had been attached this injury would not have occurred. Heichel v. Lima-Hamilton Co., 98 F.Supp. 232, 236, 237 (D.C.Ohio 1951). These trucks are made to be used by operators such as the plaintiff and the manufacturer owes a duty to such individuals to provide a safe machine.

Comment (1) of Section 388 of the Restatement,[3] which deals with warnings given to third persons, states in pertinent part:

"* * * *The giving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability.* It is merely a means by which this information is to be conveyed to those who are to use the chattel. *The question remains whether this method gives a reasonable assurance that the infor-*

---

3. Section 388 reads:
"One who supplies directly or through a third person a chattel for another to use, is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be in the vicinity of its probable use, for bodily harm *caused by the use of the chattel in the manner for which and by a person for whose use it is supplied,* if the supplier

"(a) *knows or from facts known to him should realize that the chattel is or is likely to be dangerous for the use for which it is supplied;* and

"(b) *has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition;* and

"(c) *fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be so.*" (Emphasis supplied)

*mation will reach those whose safety depends upon their having it.*

\* \* \* \* \* \*

"Here, as in every case which involves the determination of the precautions which must be taken to satisfy the requirements of reasonable care, *the magnitude of the risk involved must be compared with the burden which would be imposed by requiring them* (see § 291), *and the magnitude of the risk is determined not only by the chance that some harm may result but also the serious or trivial character of the harm which is likely to result* (see § 293). *Since the care which must be taken always increases with the danger involved, it may be reasonable to require those who supply through others chattels which if ignorantly used involve grave risk of serious harm to those who use them and those in the vicinity of their use, to take precautions to bring the information home to the users of such chattels which it would be unreasonable to demand were the chattels of a less dangerous character* \* \* \* *In addition to this, if the danger involved in the ignorant use of a particular chattel is very great, it may be that the supplier does not exercise reasonable care in entrusting the communication of the necessary information to even a person whom he has good reason to believe to be careful. Many such articles can be made to carry their own message to the understanding of those who are likely to use them by the form in which they are put out, by the container in which they are supplied, or by a label or other device, indicating with a substantial sufficiency their dangerous character. Where the danger involved in the ignorant use of their true quality is great and such means of disclosure are practicable and not unduly burdensome, it may well be that the supplier should be required to adopt them."* (Emphasis supplied)

The factual question of whether Y. & T. had given any *effective warning* in this case was covered by our charge to the jury which has not been attacked by this motion.

 Where the truck is intended for *immediate use* the lessor owes a duty to the *person* who may use the chattel to make it safe for him or to warn him of any danger. The Restatement at § 408 states as follows:

"Section 408. *Lease of Chattel for Immediate Use.*

"One who leases a chattel as safe for immediate use, is subject to liability to those whom he should expect to use the chattel, or to be in the vicinity of its probable use, for bodily harm caused by its use in a manner for which, and by a person for whose use, it is leased, if the lessor fails to exercise reasonable care to make it safe for such use or to disclose its actual condition to those who may be expected to use it."

Comment (a) of Section 408 states in pertinent part:

"a. *The fact that a chattel is leased for immediate use* makes it unreasonable for the lessor to expect that the lessee will do more than give it the most cursory of inspections. *The lessor must, therefore, realize that the safe use of the chattel can be secured only by precautions taken by him before turning it over to the lessee.* If the chattel is made by the lessor, he is subject to liability under the same rules as are stated in Sections 395 to 398, as determining the liability of a manufacturer of chattels to be put upon the market." (Emphasis supplied)

 The issues of whether the "magnitude of the risk" outweighed the burden of warning the plaintiff of the danger and whether this chattel was intended for immediate use were questions for the trier of fact, and we find the jury's decision reasonably supported by the evidence. Allis Chalmers Mfg. Co. v. Wichman, 220 F.2d 426 (8 Cir., 1955) cert.

den. 350 U.S. 835, 76 S.Ct. 71, 100 L.Ed. 745 (1955); and Heichel v. Lima-Hamilton, supra.

The plaintiff was the unfortunate victim of an economic bargain which sacrificed his safety to the more expedient needs of closing a sale to make a profit. We cannot say as a matter of law that the evidence contained in this record does not support the verdict.

### ORDER

AND NOW, this 7th day of August, 1963, the defendant's motion for judgment notwithstanding the verdict is denied.

### Supplemental Opinion Sur Defendant's Petition and Request to Amend Opinion.

 In our Opinion filed August 7, 1963, in this case, we denied the defendant's motion for judgment n.o.v. One of the bases of our decision was the defendant's failure to move for a directed verdict *at the close of all the evidence.* This step is *mandatory* before the conclusions of a jury can be attacked by any post-trial motion under Fed.R.Civ.P. 50 (b).[1]

During the course of this extremely well tried case discussions with counsel were held in chambers which were not transcribed. Counsel for the defendant has submitted an affidavit which sets forth *his* recollection of what transpired at these meetings. The subjects pursued by both parties were confined to legal argument and settlement.

On May 1, 1963, at about 4:45 p. m., counsel for the defendant deposited a memorandum of law with our clerk. The next morning at 9:30 a. m., counsel for the defendant presented his points for charge to the Court in chambers and we considered them and his memorandum of law in the presence of all counsel. At this conference the defendant reaffirmed his legal position which had remained constant throughout the trial.[2] At 10:30 a. m. we convened the Court and neither party presented any motions for our consideration. After counsel had completed their closing speeches we charged the jury.

In retrospect, the defendant would have us attribute to its memorandum of law[3] and its point for charge No. 1 (as set forth in our Opinion) the effect and import of a motion for a directed verdict under Fed.R.Civ.P. 50(a). This we cannot do. When a rule is so lucid in its language and emphatic in its conditions, it is beyond our power to relax its strictness without violating the Seventh Amendment. Mutual Ben. Health & Accident Assn. v. Thomas, 123 F.2d 353, 355 (8 Cir. 1941).

Nothing was said at any of these conferences in chambers which in any way precluded the defendant from filing a written motion with specific reasons as required by Rule 50(a). It may very well be that counsel for defendant, having at the last moment filed a written memorandum of law covering the entire case and having been informed by the Court, as he states in his affidavit, that his point for binding instructions would be denied, he assumed that the rigid requirements of Rule 50(a) had been met. As stated in our original Opinion and herein, we are powerless to waive the procedural requirements.

In conclusion, we reaffirm our original Opinion on this procedural question and state further that notwithstanding that determination the defendant's motions would have been denied on the factual issues alone. However, counsel for plaintiff raised the procedural issue at the

1. See Advisory Committee's Note to Fed. R.Civ.P. 50(b), as amended, which states as follows:
 "Subdivision (b). A motion for judgment notwithstanding the verdict will not lie unless it was preceded by a motion for a directed verdict made at the close of all the evidence."

2. Only at the argument on the post-trial motion did the defendant's counsel change his position regarding the plaintiff's alleged contributory negligence.

3. Docketed May 2, 1963 (Document No. 38).

argument on the post trial motions and we feel compelled to determine that question.

Defendant's Petition, Affidavit and Memorandum have been docketed as requested. The foregoing Supplemental Opinion is incorporated into our original Opinion in this case.