Harold MURPHY, Plaintiff-Appellee,

v.

EATON, YALE & TOWNE, INC.,
Defendant-Appellant.

No. 20543.

United States Court of Appeals,
Sixth Circuit.

June 8, 1971.

**318**

Edward D. Wells, Grand Rapids, Mich., for defendant-appellant; Cholette, Perkins & Buchanan, Grand Rapids, Mich., on brief.

Robert J. VanLeuven, Muskegon, Mich., for plaintiff-appellee; Marcus, McCroskey, Libner, Reamon, Williams & Dilley, Muskegon, Mich., on brief.

Before WEICK, CELEBREZZE and BROOKS, Circuit Judges.

WEICK, Circuit Judge.

This is a products liability case governed by Michigan law. Plaintiff sued Eaton, Yale & Towne, Inc. (Eaton), the manufacturer of a forklift truck, for personal injuries sustained by him when one of three large, heavy bales of waste hides (which bale he had placed on top of the other two on the forklift, all three of which he was attempting to lift into a gondola car) tilted and fell backwards onto his back, severely injuring him. Plaintiff's complaint, filed in the District Court, contained four counts charging Eaton with negligence, wanton and wilful misconduct, breach of express and implied warranties, and strict liability in tort.

Plaintiff withdrew the counts of negligence and strict liability in tort, and on his motion at the conclusion of all of the evidence the Court directed the jury to return a verdict in favor of the plaintiff on the counts of wanton and wilful misconduct and implied warranty, and submitted to the jury only the issue of damages. The jury returned a verdict in favor of the plaintiff in the amount of $54,000, upon which judgment was entered with interest from the date of the filing of the complaint.

Eaton appealed. It contends that the District Court erred in directing a verdict in favor of plaintiff; that the Court should have directed a verdict in favor of defendant, or at least should have submitted the factual issues to the jury; that the Court erred in excluding relevant testimony on the issue of implied warranty and in admitting evidence as to a change in defendant's policy after the accident; and that the Court further erred in its instructions on damages.

At the oral argument we inquired of counsel for plaintiff whether he could furnish us with any Michigan decision sustaining the direction of a verdict in favor of plaintiff in an action for damages involving either wanton and wilful misconduct or implied warranty. He was

unable to furnish us with a single authority from Michigan, or any other place where such procedure in this type of litigation had ever been sanctioned. The District Court also held irrelevant the defenses of contributory negligence, assumption of risk, and misuse of the product. We reverse.

It was the claim of the plaintiff that Eaton should have equipped the forklift truck with a load backrest and an overhead guard to protect the operator from falling objects, and that its failure to do so constituted not only wanton and wilful misconduct but also breach of implied warranty of witness and merchantability. The fact is that Lakeshore Materials & Handling Co., the dealer which purchased the forklift truck from Eaton, also handled the products of other manufacturers. It ordered the truck from Eaton without either a load backrest or an overhead guard. The written order credited Lakeshore with $155, which was the selling price of the load backrest and overhead guard. Lakeshore carried in stock a supply of load backrests, overhead guards, and masts, and sold them to customers who desired to purchase them. Lakeshore had three sources of supply for these accessories, namely, Eaton, a local welding and fabricating shop, and its own shop.

Lakeshore sold the truck in question to plaintiff's employer, Whitehall Leather Company, which ordered it without the accessories. Whitehall had purchased its first truck direct from Eaton in 1957; and from 1960 to 1969 it had purchased thirteen additional Eaton trucks from Lakeshore. It traded in two old trucks on the truck in question. At the time of the trial, Whitehall had a total of six Eaton trucks, five of which were small (including the truck in question), and one large truck. None of these trucks was equipped with load backrests or overhead guards. Whitehall did not want the accessories because of the presence in its plant of low ceiling pipes and doors.[1]

It is the contention of plaintiff that Eaton nevertheless should have compelled its dealers to purchase the accessories even though they had them in stock and did not need or want them, and further should have prohibited its dealers from selling the trucks without the accessories. Eaton had no knowledge of the persons or purchasers to whom the dealers sold their trucks, nor of the uses to which the trucks would be put.

The truck in question had a telescopic mast which could lift a load about nine feet. The top of the mast, when lowered, was 73 inches above the ground. An overhead guard on the truck would have increased this height to 85 inches.

The fork on each truck was equipped with a back about 21 inches in height, which operated as a backrest providing protection to that height against the slipping of loads. A load backrest would have added an additional 27 inches in height.

Prior to 1965 Eaton's trucks were not equipped with either overhead guards or backrests as standard equipment. In

1. Roger Andersen, President of Lakeshore, testified as to his conversation with Dexter King, Purchasing Agent of Whitehall, as follows:

"Q. Tell us in substance what this conversation was.

"A. Our conversation was relative to the overall heighth that we would furnish in quoting a lift truck to them; the overall heighth being determined by either the mast, or overhead guard if the guard is higher than the mast.

"We toured certain parts of their building and determined they had low doors, low pipes in areas that would require a low overall heighth of a truck. We established a low mast heighth and determined that the overhead guards would be too high to go through these (294) areas.

"Q. Between you, in your discussion, was that decided that the overhead guards could not be used at that plant?

"A. Yes, that is my recollection." The District Judge ordered this testimony stricken as being irrelevant and immaterial. In our judgment this testimony, as well as the evidence offered in a separate record, was admissible on the issue whether a warranty should be implied. It was error to exclude it.

1965 Eaton issued to dealers a directive that it would equip all trucks with overhead guards and backrests except when specifically ordered not to do so. Lakeshore purchased the truck in question on December 9, 1966. Plaintiff offered testimony over objection to the effect that after the accident Eaton changed its policy and required all dealers to purchase these accessories, whether or not they wanted them.

On the truck in question there was a black and white metal plate attached to the hood, immediately behind the lever controls, in plain view of the operator, a photocopy of which is as follows:

**FOR SAFETY**

ONLY AUTHORIZED DRIVERS MAY OPERATE THIS TRUCK

DO NOT HANDLE LOADS IN EXCESS OF RATINGS SHOWN ON NAME PLATE.
DO NOT OPERATE TRUCK UNLESS FAMILIAR WITH SUGGESTIONS CONTAINED IN OPERATOR'S MANUAL PROVIDED BY YALE MATERIALS HANDLING DIVISION. VEHICLE SHOULD BE EQUIPPED WITH OVERHEAD GUARD AND / OR LOAD BACKREST

EXHIBIT 3
Date 3/3/70
Gloria Coppin
Court Reporter

[A4106]

There was riveted to the cowl of the truck a plastic envelope containing a manual with instructions for safe loading and operation of the truck. In the packet there was a card containing the statement that a key chain with a little pocket-knife would be furnished by Eaton free to the operator who returned another card which stated, "Yes, I have read the safety manual concerning the Yale lift truck below. Please send me a free Yale keychain." Among the instructions was the following: "Do not carry or attempt to lift unstable or unsecure loads."

The American Standard Safety Code for powered industrial trucks (ASA), offered in evidence by plaintiff, treats the load backrest and overhead guard as accessories. With respect to overhead guards and load backrests it provides:

"ACCESSORIES AND ATTACHMENTS

"*Driver's Overhead Guard*—A powered industrial truck accessory designed as a protective overhead framework mounted on a truck to protect the driver from falling objects, or low height obstructions.

"*Load Back Rest*—A powered industrial truck accessory consisting of a vertical protective framework mounted on the lifting carriage of a high-lift truck to prevent the load, or part of it, from falling toward the driver or operator.

"*Front-End Attachments*—Various nonmechanical and mechanically, electrically, or hydraulically operated devices attached to the front end of powered industrial trucks for handling various kinds of products and materials as single or multiple units. Typical units include: fork extensions, roll clamps, rotating and side-shifting carriages, magnets, rams, crane arms or booms, local stabilizers, scoops, and dumping bins.

\* \* \* \* \* \*

"604 DRIVER'S OVERHEAD GUARD

"Wherever industrial truck operation exposes operator to danger from falling objects, the truck shall be equipped with a driver's overhead guard. It shall be of sufficient strength to support a uniformly distributed static test load in accordance with the following Table and Graph A, but it is not intended to withstand the impact of a capacity load falling from any height." (pp. 14, 16)

The exceptions are stated as follows:

"*Exceptions*: Where overall height of truck with forks in lowered position is limited by head room conditions and there is insufficient space for the above amounts of vertical clearance or for the operator to assume a normal driving position, such clearances may be reduced or the overhead guards may be omitted; but special attention shall be given to stack conditions in the operating area, such as weight of units and stability, to reduce this hazard to the operator." (p. 18)

With respect to load backrests, the Code provides:

"605 LOAD BACK REST

"Fork trucks which handle small objects or unstable loads shall be equipped with a vertical load back rest or rack which shall have height, width, and strength sufficient to prevent the load, or part of it, from falling toward the mast when the mast is in a position of maximum backward tilt, and shall have no opening greater than the smallest parcel carried." (p. 18)

With respect to operators, the Code provides:

"806 They shall move only loads which are securely and safely loaded."

Plaintiff went to work for Whitehall in October, 1966. He was injured on June 10, 1968. On the day of the accident he loaded two bales of hides on the fork lift truck and placed a third bale on top of the other two. Each bale was about four and one-half feet long, 18 to 19 inches high, and a "good foot" wide, and each weighed about 750 pounds. They were not tied.

It is obvious that if plaintiff had lifted one or even two bales placed side by side on the fork lift, no accident could have occurred because the fork had a guard of 21 inches. It was only when he placed a third bale on top of the other two that the third bale fell off backwards when he was lifting the load onto the gondola car, outside the plant.

There was evidence that prior to plaintiff's accident, namely on November 2, 1967, an operator named Roy Amaya had been injured by a bale when it fell off the truck (he had stacked one bale on top of another). The company then adopted a rule providing that only one bale be lifted at a time. Plaintiff testified, however, that he was not informed of the rule. Other employees testified that after the rule was adopted they saw only one bale being lifted and carried at a time.

Plaintiff's foreman, Keith E. Smith, testified that prior to plaintiff's accident, he had reprimanded plaintiff several times for his reckless operation of the forklift truck, and had recommended to his superior that plaintiff be removed from the job because "he appeared to be accident prone." Plaintiff had wrecked one piece of machinery by driving into it, and had wrecked numerous skids.

In our opinion, there was no proof of wanton and wilful misconduct as defined by the Michigan Supreme Court. LaCroix v. Grand Trunk Western R. R., 379 Mich. 417, 152 N.W.2d 656 (1967); Heider v. Michigan Sugar Co.,

375 Mich. 490, 134 N.W.2d 637 (1965). It was error, therefore, to direct a verdict in favor of plaintiff on the wilful and wanton misconduct count.

No doubt plaintiff withdrew the count of simple negligence because that count would have been subject to the defense of contributory negligence, which defense is not available in an action for breach of implied warranty. Bahlman v. Hudson Motor Car Co., 290 Mich. 683, 288 N.W. 309 (1939).

## IMPLIED WARRANTY

In order to direct a verdict on the count of implied warranty the District Judge held as a matter of law that the forklift truck was defective and that there was a causal relationship between the defect and plaintiff's injuries. He relied on Piercefield v. Remington Arms Co., 375 Mich. 85, 133 N.W.2d 129 (1965), and held that the defenses of assumption of risk, contributory negligence, and misuse of the product by the plaintiff, were not available to Eaton. Eaton was even deprived of the defense that the conduct of the plaintiff, whether denominated as contributory negligence, sole negligence, assumption of risk or misuse of the truck, intervened to proximately cause the injuries which he sustained.

■ In our judgment, this imposed upon Eaton the absolute liability of an insurer, which is not the law of Michigan. Fisher v. Johnson Milk Co., 383 Mich. 158, 174 N.W.2d 752 (1970); Barefield v. LaSalle Coca-Cola Co., 370 Mich, 1, 120 N.W.2d 786 (1963).

Undoubtedly the District Judge experienced the same difficulty as the Michigan trial judge, who said:

"The law itself is not too clear and I am doing the best I can to explain it as I understand it from the cases that have been handed down." Quoted in Macres v. Coca-Cola Bottling Co., 290 Mich. 567, 570, 287 N.W. 922, 923 (1939).

An article in Wayne Law Review concludes:

"The history of products liability in Michigan has been a tale of confusion and uncertainty." 15 Wayne L.Rev. 1558, 1580 (1969).

On this same subject see Spence v. Three Rivers Builders & Masonry Supply Co., 353 Mich. 120, 90 N.W.2d 873 (1958).

Of this we are certain, the Michigan Supreme Court has not yet imposed absolute liability on manufacturers in prodducts liability cases, and until it does it is not our function to do so in a diversity case.

■ The District Court relied on *Piercefield*, which involved a dangerous instrumentality, namely, defective ammunition for a shotgun. We do not regard a forklift truck as a dangerous instrumentality, and no Michigan cases have been cited to us holding that automobiles and trucks are dangerous instrumentalities. Furthermore all that *Piercefield* held was that privity is no longer required in implied warranty cases, and that the notice provisions of the Uniform Commercial Code are inapplicable. This was clearly pointed out in Browne v. Fenestra, Inc., 375 Mich. 566, at 571–572, 134 N.W.2d 730, at 733 (1965), where the Court stated:

"Aside from the above it is important to stress a procedural difference between *Piercefield* and this case of Browne. In *Piercefield* two purposely restricted questions of law came up via granted uniform motions to strike made by all defendants. All such defendants, joining in one brief, relied here solely upon such questions (validity of the defenses of no privity and absence of notice under section 49 of the uniform sales act; CL 1948, § 440.49 [Stat.Ann. § 19.289]).

"Whether *Piercefield* can make out a case, under the second count of his declaration, as against one or all of the defendants sued by him, and whether any one or more of such defendants is possessed of a defense (other than of no privity and failure of section 49 notice) has not as yet been determined.

Here the defendants Fenestra and McQuillan have been found, upon trial to a jury of disputed facts, guilty of actionable negligence. The same jury has found defendant Ward responsible to plaintiff for breach of an implied warranty of fitness. *Piercefield*—with *Henningsen* above—decided, so far at least as concerns the case at bar, only that present defendant Ward was not entitled to rely upon its defenses of no privity, disclaimer of liability, and elimination of implied warranty by express warranty." (Footnote omitted)

Both *Piercefield* and *Browne* cited with approval Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1, on which we will comment later.

The District Judge was also of the view that Eaton was "greedy" in selling the truck without accessories, which gave it an advantage over its competitors. It is a rather violent assumption to presume, without any evidence, that a manufacturer is "greedy" for not wanting to sell its accessories at a profit.

There was no evidence that the forklift in question contained defective materials or was made with improper workmanship. The only claim as to breach of implied warranty was that the truck should have been equipped with a load backrest and an overhead guard. The central question where such a "defect in design" is alleged should be what the manufacturer intended its product to do.

While the fact that the truck in question was capable of lifting a load of three bales of waste leather to the required height may be some evidence that it was intended to be used for the lifting of such loads, it is certainly not conclusive evidence. It is for the jury to conclude whether Eaton intended for the truck, as manufactured and shipped, to be used for this purpose. There are some statements by Eaton's manager of engineering for materials handling that its forklifts were capable of such use, but there is also the fact that Eaton offered load backrests and overhead guards as ac-cessories to be used where they would be needed.

The ASA Code introduced by plaintiff indicates that forklift trucks are designed to be used for many purposes, and that in order to be designed for some uses special attachments are necessary. The fact that Whitehall ordered the truck without these accessories is at least some evidence that it understood that this truck was not intended to lift high-stacked, unstable loads. When it is recalled that Whitehall, at the time it purchased the truck in question, had in effect a rule prohibiting the stacking of loads, further doubt is cast on whether the truck was intended to be used in the manner adopted by plaintiff.

In the circumstances of this case, the District Court at least should have permitted the jury to determine whether the truck was defective for the performance of its intended uses.

## OBVIOUSNESS OF THE ALLEGED DEFECT

Whitehall, plaintiff's employer, knew that the truck was not equipped with a load backrest and an overhead guard, because it did not order these accessories. Plaintiff also knew it, and knew that none of Whitehall's trucks were so equipped, as he had operated four or five of them.

Plaintiff testified:

"Q. And now did any of those five that you operated have any overhead canopy?

"A. No, sir.

"Q. Did any of them have any kind of a load back rest?

"A. No sir.

"Q. And, of course, you knew that the first time you ever got on one of those trucks, didn't you?

"A. Yes, sir.

"Q. It was very obvious to you they weren't there?

"A. Yes, sir." (78a)

Plaintiff further testified:

"Q. Mr. Murphy, you knew, I assume that if one of these bales fell off backwards, that there was nothing there to protect you, didn't you?

"A. Yes.

"Q. And you knew that if they were piled high enough, that they were not steady on the fork, didn't you?

"A. I wouldn't say 'not steady.'

"Q. You wouldn't say it?

"A. No.

"Q. There was nothing there to protect the third bale on the top from falling over backwards, was there?

"A. It was put on there directly in the center.

"Q. Was there anything on the truck to prevent it from falling over backwards on you?

"A. No.

"Q. And you knew that, didn't you?

"A. Yes." (85a–86a)

Plaintiff had worked on a farm and knew there was danger from equipment and that he could be injured if he was not careful.

Furthermore, no injury could have resulted to the plaintiff if he had lifted only one bale at a time, as required by Whitehall's rule, or even two bales placed side by side on the fork. There is substantial dispute in the record as to whether the stacking of a load in the manner chosen by plaintiff would even be a safe and secure load.

Although it was the function of plaintiff's employer, not Eaton, to give him instructions as to proper use of the forklift in its plant, Eaton attempted to give instructions by riveting a booklet on the cowl of the lift truck, and placed the "For Safety" warning in front of the operating controls where the operator could see it. Plaintiff claimed that the booklet had been removed and that the warning plate was dirty, so that he saw only the words "For Safety"; but that is not the fault of Eaton.

Despite the above evidence, the District Judge deprived the defendant of the defense that plaintiff had interjected an intervening cause of his injury. We are of the opinion that in determining whether Eaton breached a duty embodied in its implied warranty, consideration must be given to whether the alleged defect was obvious to the ordinary user. The District Court rejected the "patent-latent" defect distinction, but the Michigan Supreme Court has subsequently placed beyond any doubt Michigan's adherence to the doctrine. Fisher v. Johnson Milk Co., 383 Mich. 158, 174 N.W.2d 752 (1970).

As the Court pointed out in *Fisher*, where the defect is obvious, the manufacturer has no duty which can be breached in the circumstances of the case:

"There was no inherent, hidden or concealed defect in the wire carrier. Its manner of construction, how the bottles would rest in it, and what might happen if it were dropped, upright, on a hard surface below, with the possibility that the contained bottles might break, was plain enough to be seen by anyone including a patent attorney as well as a milk dealer. There is no duty to warn or protect against dangers obvious to all."

In Baker v. Rosemurgy, 4 Mich.App. 195, 144 N.W.2d 660 (1966), it was held that plaintiff's use of a defective rifle for four years with knowledge of the defect precluded recovery on negligence, strict liability, or implied warranty.

Campo v. Scofield, 301 N.Y. 468, 95 N.E.2d 802 (1950), was cited with approval by the Supreme Court of Michigan in *Fisher*. In *Campo* the highest court in New York stated:

"If the manufacturer does everything necessary to make the machine function properly for the purpose for which it is designed, if the machine is without any latent defect, and if its functioning creates no danger or peril that is not known to

the user, then the manufacturer has satisfied the law's demands. We have not yet reached the state where a manufacturer is under the duty of making a machine accident proof or foolproof. Just as the manufacturer is under no obligation, in order to guard against injury resulting from deterioration, to furnish a machine that will not wear out * * *, so he is under no duty to guard against injury from a patent peril or from a source manifestly dangerous. * * * In other words, the manufacturer is under no duty to render a machine or other article 'more' safe—as long as the danger to be avoided is obvious and patent to all."

See Gossett v. Chrysler Corp., 359 F.2d 84 (6th Cir. 1966).

In Cintrone v. Hertz Truck Leasing & Rental Service, 45 N.J. 434, 212 A. 2d 769, 782 (1965), it was held that plaintiff's operation of a truck equipped with defective brakes, after discovery of the defect, bars recovery. The opinion in this case was written by the same judge who wrote the opinion for the court in Henningsen v. Bloomfield Motors, 32 N.J. 358, 161 A.2d 69. *Henningsen* was cited with approval by the Supreme Court of Michigan in *Piercefield* and in Browne v. Fenestra, *supra*.

In Barefield v. LaSalle Coca-Cola Bottling Co., 370 Mich. 1, 120 N.W.2d 786 (1963), the suit was for breach of implied warranty because of glass particles in a beverage. The Court said:

"* * * [W]arrantors are not to be held as guarantors against injury to consumers resulting from the consumer's *misuse* of the product. * * * [T]he defendant at bar was entitled to claim that plaintiff should not have continued to drink its product after she discovered, or should have discovered, it contained glass particles. The proofs were such that the jury could have found, following the challenged instruction, that plaintiff's injuries occurred only after she had warning that something was wrong with her Coca-

Cola; that she should not have continued thereafter, without examination, to consume the remainder of her drink; and that, having done so in disregard of the known danger, it cannot be said that she proceeded in reliance upon defendant's implied warranty of fitness." 370 Mich., at 5, 120 N.W.2d at 788.

See Gossett v. Chrysler Corp., *supra*.

It can hardly be said that *Barefield* has been overruled since it was cited by the Supreme Court of Michigan as late as in *Piercefield*.

Plaintiff relies on Brandon v. Yale & Towne Mfg. Co., 220 F.Supp. 855 (E.D. Pa.1963), affirmed, 342 F.2d 519 (3rd Cir., 1965), in which the Court, in a short per curiam opinion, affirmed a $250,000-judgment in an action based on negligence and governed by Maryland law. The District Court held that Yale did not comply with Rule 50(a) by moving for a directed verdict, and that there was evidence to support the verdict of the jury. Judge McLaughlin dissented on the grounds that Yale did comply with Rule 50(a) and that plaintiff had misused the forklift. Judge Hastie also dissented, stating:

"Applying section 388 to this case, it is clear that the absence of lateral support and the resultant danger that a stacked load standing loosely on the lift platform would topple and fall from the platform if it should be tilted during lifting, were just as apparent to any user as to the manufacturer. There was no hidden danger or defect here. Indeed the injured workman admitted that he was aware, as he must have been, that tilting would cause the stacked load of corrugated paper to collapse and fall from the lift.

"It seems to me that these facts preclude any finding that the manufacturer was derelict in his duty as defined and limited by section 388(b) of the Torts Restatement. Yet, the jury found that the manufacturer had been negligent and that the user was not contributorily negligent. It may well have been that the user's employer was

negligent in requiring him to use this lift for high stacking. However, the defendant here is not the employer, but the manufacturer, whose liability is limited by the principles stated in section 388."

The forklift in *Brandon* was a much larger one, adaptable for high stacking, with a lifting capacity of 144 inches in the air. The forklift in the present case was a standard truck with a lifting capacity of only 108 inches. A load backrest and an overhead guard had been ordered (in *Brandon*), but they were not supplied because they were not available. No warning plate had been attached to the truck. It will also be noted that in *Brandon*, unlike the present case, the issues were submitted to the jury.

We believe the decision of the Seventh Circuit in Posey v. Clark Equip. Co., 409 F.2d 560 (1969) is more applicable to our case since it involved a standard, small, forklift like the one we are concerned with, and Indiana law, which we think comports with Michigan law. It was Posey's claim that the manufacturer "should have refused to sell the forklift without a guard or [should] have attached a warning about using a guard in high stack areas, or both." Posey further claimed that if a warning notice had been placed on the truck, the employer might have purchased a guard and instructed his employees to install it whenever the truck was used among high stacks.

Judge Fairchild, in writing the opinion for the Court, said:

"Although Indiana law recognizes products liability based on negligence, in the absence of privity, the defect must be hidden, and not normally observable, constituting a latent danger. Although a manufacturer who has actual or constructive knowledge of an unobvious danger in the use of his product is subject to liability for negligence for failure to warn users of the danger, he has no duty to warn if the danger be obvious.

\* \* \* \* \* \*

"Although defendant Clark, as a leading manufacturer of fork lifts, was probably more aware of the range of problems and hazards encountered in their use than the ordinary user or operator of fork lifts, we conclude as a matter of law that this is not a situation where only persons of its special experience would realize the danger which might befall an unprotected operator when working in proximity to high stacks of cartons. Plaintiff urges, essentially, that this question ought to be left to a jury, but it is our judgment that there is no evidence to support a finding that Clark had a duty, under the circumstances, to supply a warning notice." 409 F.2d 563–564.

In our case a metal warning sign was attached to the truck, stating that it should be equipped with overhead guard and load backrest. Plaintiff contends that this was an admission that the truck without the accessories was dangerous. Nevertheless, it was a clear warning which was in plain view of the truck's operator, as it was in front of the truck's controls. Plaintiff contends that part of the metal sign was dirty, and he did not read it. Even if true, this was not the fault of Eaton.

## UNIFORM COMMERCIAL CODE

This Code has been in force in Michigan since 1964. M.S.A. § 19.1101 et seq. M.C.L.A. § 440.1101 et seq.

§§ 19.2316(3) (b) and (c), M.C.L.A. §§ 440.2316(3) (b, c), provide:

"(b) when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and

"(c) an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade."

In Comment 8 under this section, it is stated:

"Of course if the buyer discovers the defect and uses the goods anyway, or if he unreasonably fails to examine the goods before he uses them, resulting injuries may be found to result from his own action rather than proximately from a breach of warranty."

In Erdman v. Johnson Bros. Radio & Television Co., 260 Md. 190, 271 A.2d 744 (Md.Ct. of App. 1970), the action was brought under the Uniform Commercial Code, for breach of implied warranty. The Court said at 747:

"It would appear that an individual using a product when he had actual knowledge of a defect or knowledge of facts which were so obvious that he must have known of a defect, is either no longer relying on the seller's express or implied warranty or has interjected an intervening cause of his own, and therefore a breach of such warranty cannot be regarded as the proximate cause of the ensuing injury. Such an interpretation gives effect to the true nature of the action involved and the intention of the U.C.C. without needlessly involving the courts in a discussion of whether the implied warranty is founded in contract, tort, or both.  *  *  *

*    *    *    *    *    *

"Thus, considering the facts in the case at bar we think it no more than an exercise in semantics to quibble over whether the actions of the appellants amounted to an abandonment of their reliance on the seller's implied warranty, or contributory negligence, or indeed whether we should view the trial judge's finding of contributory negligence on the plaintiffs' part as tantamount to a finding of an abandonment by them of their reliance on the implied warranty. The important factor under either theory or an amalgam of them is that, although there have been a breach of the warranty, that the breach is no longer considered 'the proximate cause of the loss.' U.C.C. § 2–314, Comment 13. That is, the defect in the set, of which the plaintiffs had knowledge, could no longer be relied upon by them as a basis for an action of breach of warranty." 271 A.2d at 747, 749.

See Restatement, Torts 2d, § 402A, Comment n on page 356.

In Comment 9 to M.S.A. § 19.2316 it is stated:

"Thus, where the buyer gives detailed specifications as to the goods, neither of the implied warranties as to quality will normally apply to the transaction unless consistent with the specifications."

It was the law of Michigan prior to the adoption of U.C.C. that no warranty of fitness will be implied when the buyer specifies what he wants to buy from the seller. Automatic Welding Mach. Co. v. Lauer & Assoc., 347 Mich. 218, 79 N.W. 2d 627 (1956); Beaman v. Testori, 323 Mich. 194, 35 N.W.2d 155 (1948); F. M. Sibley Lumber Co. v. Schultz, 297 Mich. 206, 297 N.W. 243 (1941); Morse Boulger Destructor Co. v. City of Saginaw, 264 F.2d 847 (6th Cir. 1959). See 46 Am.Jur.Sales, § 344 at p. 528.

In the present case, both Lakeshore and Whitehall got exactly what they ordered.

No case has been cited to us, nor have we found any, holding that a warranty should be implied under the circumstances of this case. This case is unique and without precedent in its holding by the District Court that a manufacturer is liable for not supplying accessories not ordered by either the dealer or the consumer.

Upon retrial of the case the District Court shall submit to the jury the factual issues, including whether the forklift truck was defective in any respect, and if so, of what the defect consisted; if defective, whether the defect was obvious or hidden, and whether plaintiff had knowledge of the danger in using the truck in the manner which he did; whether, considering all the facts and circumstances of the case, Eaton should have anticipated injury to the plaintiff;

whether the load which plaintiff was lifting was stable and secure; whether there was a causal relationship between the alleged defect and plaintiff's injury; whether there was an intervening cause which proximately produced plaintiff's injury, such as the conduct of plaintiff in misusing the truck; misuse would consist of operating the truck with an unstable or unsecure load, or operating the truck in a negligent and careless manner, or operating the truck in violation of instructions issued by Eaton, of which instructions plaintiff had knowledge; and whether Eaton gave adequate notice of the danger. The District Court might find it helpful to the jurors to propound to them interrogatories eliciting findings on these issues of fact.

### OTHER ERRORS

In our opinion, the admission in evidence of plaintiff's Exhibit 6, which is a pamphlet issued by the Department of Labor, entitled *On the Job Slaughter; A National Shame*, containing grisly photographs of industrial accidents in which workmen were injured, maimed, or killed, was prejudicial error. None of the photographs was of the plaintiff, and the pamphlet was not admissible on any issue in the case.

Evidence as to a change in policy by Eaton after the accident with respect to including the accessories as part of the original equipment, was inadmissible to establish either negligence (the count of negligence was withdrawn) or breach of warranty. Mandjiak v. Meijer's Super Markets, 364 Mich. 456, 459, 110 N.W.2d 802 (1961); Felske v. Detroit United Ry, 166 Mich. 367, 372, 130 N.W. 676 (1911); Columbia & P. S. R. R. v. Hawthorne, 144 U.S. 202, 12 S.Ct. 591, 36 L.Ed. 405 (1892); Northwest Airlines v. Glenn L. Martin Co., 224 F.2d 120 (6th Cir. 1955), cert. denied, 350 U.S. 937, 76 S.Ct. 308, 100 L.Ed. 818 (1956).

It was error to instruct the jurors: "Nothing can fairly be termed compensation which does not put the injured party in as good a condition as he would have been if the injury had not oc-curred. Nothing short of this is adequate."

Plaintiff relies on Grand Rapids & Ind. R. R. v. Heisel, 47 Mich. 393, 11 N.W. 212 (1882), as authority for this instruction, but such reliance is misplaced. In the *Grand Rapids* case the instruction was given in an action for property damage and was inapplicable to a suit for personal injuries. The instruction was misleading as it might not be possible ever to restore plaintiff to a condition as good as he was prior to the accident, and no amount of money could accomplish this purpose.

We also think it was inappropriate for the Court to tell the jury, "That which is adequate compensation today may not meet the cost of living in the future." It may or it may not meet the cost of living in the future, in fact it might even exceed the cost of living, but in any event the jury ought not to be instructed to speculate on future fluctuations in the value of the dollar. Nor do the cases cited by plaintiff permit such an instruction.

The judgment of the District Court is reversed, and the cause is remanded for a new trial.