Kelly SCHNEBLY, a minor, by Orvin H. Schnebly and Wanda Schnebly, natural guardians and next friends, et al., Appellees,

v.

John M. BAKER, Appellant.

John M. BAKER, Appellant,

v.

ST. JOSEPH MERCY HOSPITAL OF DUBUQUE, Iowa, et al., Appellees.

No. 55408.

Supreme Court of Iowa.

April 24, 1974.

710

Laird, Burington, Bovard & Heiny and William Pappas, Mason City, and Theodore G. Garfield, Ames, for appellant.

Karr, Karr & Karr, Webster City, and Robins, Davis & Lyons, John F. Eisberg, St. Paul, Minn., and Robert M. Wattson, Minneapolis, Minn., for appellees Schnebly.

Walter C. Schroeder, Mason City, and Ahlers, Cooney, Dorweiler, Allbee & Haynie, Des Moines, for appellee Hospital.

Brown, Kinsey & Funkhouser and Shepard & Shepard, Mason City, for appellees Joyce and Potter.

UHLENHOPP, Justice.

This is an appeal by defendant John M. Baker from a judgment for $1,044,798 against him for malpractice and from dismissal of his cross-petition against others for indemnity or contribution. The parties take divergent views of the facts but we consider the evidence in the light most favorable to the trial court's findings. Reichle v. Zeman, 204 N.W.2d 636 (Iowa).

Orvin H. Schnebly has Rh-positive blood. His wife, Wanda Schnebly, has Rh-negative blood. Prior to the present events, Mr. and Mrs. Schnebly had three children. Their first child had Rh-positive blood and their second and third children had Rh-negative blood.

Erythroblastosis fetalis is a disease of the fetus and the newborn resulting from blood group incompatibility between a mother and child. If an Rh-negative mother conceives an Rh-positive fetus and some of the fetus's blood crosses the pla-

cental barrier into the mother's bloodstream, the mother's system forms antibodies. Generally the fetus is unaffected. But if the mother subsequently conceives another Rh-positive fetus, the mother's antibodies may cross the placental barrier into this fetus and destroy its red blood cells, producing bilirubin. Accumulated bilirubin in a newborn child causes cell death, and when that cell death occurs in the central nervous system including the brain, the damage is irreversible. Brain damage caused by bilirubin is called kernicterus. See Price v. Neyland, 115 U.S. App.D.C. 355, 320 F.2d 674.

Bilirubin is normally handled by the liver and is excreted in the urine or by way of the gall bladder. But during the first 72 hours of life, an infant's liver may not yet be able to handle bilirubin. The critical level of bilirubin is 20 milligrams per 100 milliliters of blood (20 mgs %), at which point brain irritation begins to occur with possible brain cell damage. The rate of rise of bilirubin in the newborn is predictable. The "indirect" bilirubin reading is the one used.

Tests for bilirubin are run in laboratories of hospitals. The reagent used in making such tests deteriorates with age, causing test results to be unreliable.

Treatment of a newborn child is indicated if the child exhibits jaundice within eight to 12 hours of birth; if the indirect bilirubin level exceeds 10 mgs % within the first 24 hours, 15 mgs % within the first 48 hours, or 20 mgs % thereafter within the first five days of life; or if the rate of rise exceeds 0.5 mgs % per hour during the first 48 hours. In Rh incompatibility cases, the physician orders a series of blood tests several hours apart following the child's birth, to keep the bilirubin level under observation. Blood tests for bilirubin are not invariably accurate; hence the physician also regularly observes the child for signs of heightened bilirubin levels. These signs include jaundice, lessened suck reflex and Moro's reaction (instinctive embracing grasp when jarred), lethargy, irritability, shrill cry, rigidity, and enlargement of liver and spleen. Treatment, when indicated, usually consists of one or more exchange transfusions of blood and is successful in a high proportion of cases. Blood transfusions in small infants are attended with moderate—although not negligible—risks.

Schneblys live in Forest City, Iowa, where Mr. Schnebly is engaged in business. Prior to the events in question Mrs. Schnebly, in addition to homemaking, worked as a bookkeeper, and was familiar with quite complicated bookkeeping systems. She had taken some college work and received "A" grades. Throughout the events in question, Mr. and Mrs. Schnebly kept each other informed regarding details. Mr. Schnebly testified he understood that a bilirubin level of 20 was the danger point and that brain damage could start thereafter.

Schneblys' physician was T. J. Irish of Forest City, a general practitioner. Schneblys and Dr. Irish were aware of the Rh incompatibility, and Dr. Irish discussed it with them during Mrs. Schnebly's pregnancy. He explained in detail what to expect, what physicians watch for in the tests, and what would be done. During the pregnancy Dr. Irish conducted tests upon Mrs. Schnebly and took X-rays. He ascertained that her antibodies were of a virulent type. Mrs. Schnebly was apprehensive and was especially worried the last month.

During the pregnancy Dr. Irish informed Dr. John M. Baker about the problem and the possible need of assistance. Dr. Baker is Dr. Irish's brother-in-law and is a pediatrician at Mason City, Iowa. He is on the staff of St. Joseph Mercy Hospital at Mason City and has performed transfusions there. By contract, pathologists George T. Joyce and Paul H. Potter have charge of the laboratory at that hospital. The Forest City hospital laboratory could also run bilirubin tests but did not have a pathologist in charge.

Mrs. Schnebly's antibodies rose toward the end of her pregnancy. Dr. Irish informed her of this, entered her at the Forest City hospital, and induced labor near the end. At 7:40 p. m. on June 8, 1964, Mrs. Schnebly was delivered of a normal full-term male child, whom Schneblys named Kelly. The child's bilirubin level at birth was 1.48 mgs %, according to the Forest City hospital laboratory. Dr. Irish so informed Dr. Baker by telephone and told Mrs. Schnebly the test was "one."

At 7:30 a. m. on June 9 the child's bilirubin had risen to 9.4 mgs %. That forenoon Mrs. Schnebly observed that the child was beginning to turn yellow. At noon Dr. Irish informed Mrs. Schnebly that the test was nine and that this was a fast rise. According to Mrs. Schnebly, Dr. Irish told her that Dr. Baker said if the test got to 20, a blood exchange might be necessary, from 20 to 25 there most certainly would be some brain damage, from 25 to 30 there would be serious damage, and from 30 to 50 the child usually went into a coma or died. Mrs. Schnebly testified she was worried and wanted to know how long they were going to wait before taking the child to Mason City. Dr. Irish said they would run another test.

By mid-afternoon on June 9, the child was more yellow, less active, and less responsive to Mrs. Schnebly. That afternoon the bilirubin had risen to 13.6. Dr. Irish so informed Mrs. Schnebly but said another test would be taken; Dr. Baker did not want the child brought to Mason City yet. At that time the rate of rise was 0.6 mgs % per hour. If that rate persisted, the critical level of 20 would be reached in the early morning hours of June 10.

On the evening of June 9 Mrs. Schnebly "just knew" that something was wrong. The child did not eat. He was yellow; the whites of his eyes were starting to turn. At 10:00 p. m. the bilirubin had risen to between 16.3 and 18—the exact figure was not ascertained. Dr. Irish was concerned.

He reported the test level to Dr. Baker. According to Mrs. Schnebly, Dr. Irish told her that the level was 17 and that Dr. Baker said to wait until morning to bring the child to Mason City for more tests and a decision on what to do.

On the morning of June 10 the child appeared worse to Mrs. Schnebly. At 7:30 o'clock that morning, Dr. Irish entered the child at St. Joseph Mercy Hospital at Mason City. Dr. Baker examined the child and ordered a complete blood count. He testified that the child's spleen and liver were not enlarged.

Pathologists Joyce and Potter had not established a procedure in the Mason City hospital laboratory to assure that the reagent used for bilirubin tests would not become overaged. On the morning of June 10 the reagent was in fact overaged and yielded wrong results. Although it is undisputed that the actual bilirubin level in the child was then approximately 25, the Mason City laboratory test result was 11.2, and that was the level reported to Dr. Baker. Dr. Baker did not question that reading; he testified the laboratory's readings had been accurate during the several years he had practiced at Mason City. On the other hand, the child was jaundiced, the Forest City test of 16 to 18.3 was inconsistent with the Mason City test of 11.2, and Dr. Baker could have ascertained that the rate of rise in the Forest City tests was internally consistent. He did not order a retest or a series of tests by the Mason City laboratory—which would probably have continued to yield wrong results anyway—but he placed his reliance on the Mason City test and assumed that the Forest City test was inaccurate. Dr. Irish relied on Dr. Baker's conclusion and reported to Mrs. Schnebly that the Mason City reading was 11, which was reassuring. Dr. Irish endeavored throughout to reassure Mrs. Schnebly.

That day Drs. Irish and Baker had the afternoon off. A urinalysis done at that time showed bile in the child's urine, signi-

fying massive destruction of the child's red blood cells. Since he was not present, Dr. Baker did not receive the report at that time. That evening Mr. Schnebly visited the child at the Mason City hospital and saw that he was jaundiced.

On the morning of June 11 a second bilirubin test at the Mason City hospital read 9.9, whereas the actual level was probably approximately 37. The clinical picture of the child would be inconsistent with 9.9, but Dr. Baker continued to rely on the laboratory and discharged the child to be returned to Forest City. The test result of 9.9 and the child's impending return to Forest City were reported to Mrs. Schnebly. Mr. Schnebly returned the child from Mason City. He testified that the child was very dark and that he told the nurse, "This baby looks just like a Chinaman. . . . He is very jaundiced and yellow." Mr. Schnebly further testified that the child had a shrill unnatural cry and did not appear well at all, and that Dr. Baker stated "the baby is very jaundiced and he is quite rigid, but we are going to rely on the test." Upon seeing the child, Mrs. Schnebly was worried. The child did not care to eat and had no sucking strength.

Dr. Irish was also worried and at 2:00 p.m. that day he had the Forest City laboratory run another bilirubin test. It yielded a result of 39.8. He reported this to Mrs. Schnebly and told her Dr. Baker said the test could not be right and to bring the child to Mason City the next morning if Dr. Irish thought necessary. According to her testimony, Mrs. Schnebly was aware that Dr. Baker insisted on relying on the Mason City bilirubin readings despite the different Forest City readings and the deepening jaundice of the child. Dr. Irish and Mrs. Schnebly discussed what should be done, and she asked about Rochester, Minnesota. Mr. Schnebly testified Dr. Irish was worried, that Dr. Irish just could not understand, he knew the child was sick, but he said he had to follow Dr. Baker's directions. Dr. Baker testified when he received the report of 39.8, he called Dr.

Joyce and asked if the Mason City hospital was having any trouble with bilirubin tests and was told no, and he also asked Dr. Joyce's opinion about the Forest City hospital laboratory and was told "there has been inaccurate results coming from there." Dr. Joyce testified he did not remember this call but that "it may well have taken place." Dr. Baker also testified he called Dr. Irish and was told the alertness and sucking ability of the child were good.

On the morning of June 12 the child appeared just as bad or worse, cried, took very little nourishment, and sucked poorly. Mrs. Schnebly testified she was nearly out of her mind with worry. Dr. Irish was also greatly worried and called in his father, a retired physician. They told Mrs. Schnebly they were going to take the child to Mason City.

The child was readmitted to the Mason City hospital about noon that day. He was somewhat rigid at times which indicated opisthotonos, a sign of brain damage. Dr. Baker ordered a bilirubin test, which read 17. He talked to the head medical technologist and told her about the discrepancies in the Forest City and Mason City tests. She discovered the faulty reagent, ran another test, which read 40, and reported that reading to Dr. Baker. Dr. Irish reported these facts to Mrs. Schnebly that same afternoon. She testified he said, "There seems to be a mistake. We have made a mistake." She further testified, "I asked him some more about this wrong solution and he said he didn't know but that when they got over there, they ran another test and it was low again, under 20 and Dr. Baker wasn't going to do anything and Dr. Irish said, 'And I ranted and raved and raised the roof until I got the head technician to come down and run another test.' Then he said they found out that they had been making a mistake. He said nobody would listen to him and they thought Kelly was all right. Dr. Baker wasn't going to do anything and he said he made a nuisance of himself and he just insisted they run that test over again."

After Dr. Baker received the report of 40, he ordered an exchange transfusion. This commenced at 3:15 o'clock that afternoon. After the transfusion, the bilirubin level dropped to 23.8. Dr. Irish reported to Mrs. Schnebly that the transfusion had gone all right and he thought another one would be necessary. A second transfusion, the next day, reduced the level to 14.6. After a slight rebound, the level declined. Mrs. Schnebly testified she felt reassured.

Very severe, permanent brain damage occurred during the time of the high bilirubin level.

The child remained in the hospital after Mrs. Schnebly was discharged. She testified that on June 21 he looked terrible, like "refugees that haven't eaten and the skin is clinging to their bones and they have a kind of dead, lost look to them." Schneblys brought the child home July 9. Thereafter the child cried continually. Dr. Irish called nearly every day. He prescribed phenobarbital. Mr. Schnebly described the situation as a nightmare. It took an hour or more to feed the child. He would hold his breath and turn dark blue and sometimes "pass out." He would spit up curdled milk and sleep but little. Mrs. Schnebly used a squeeze bag to force milk into him. The child's continuous hard crying caused a double hernia, which the Drs. Irish successfully repaired. The child required constant care, day and night.

Mr. and Mrs. Schnebly conferred with each other and kept each other up to date as to what each of them observed and what the physician said. Mr. Schnebly testified that the child did not act like a normal baby and that he was very worried about the possibility of brain damage. Schneblys suspected the child was deaf. Mr. Schnebly set off a firecracker on the floor and the child did not flinch. He testified he knew then the child could not hear.

The child continued to cry continually, to turn blue and pass out, and to vomit his food. Dr. Irish tried various medicines without success. At Dr. Irish's suggestion, Schneblys took the child to Dr. Baker in December 1964. Dr. Irish had recommended use of a pacifier, but Dr. Baker said, "Don't use the pacifier because he just sucks in the air and it makes him all the more colicky." He told Schneblys to keep the child on his right side and try Atarax which is stronger than phenobarbital, that many babies had colic and the child would outgrow it. With regard to brain damage, Dr. Baker stated it would be ten years before they would know and then they wouldn't know the extent. At trial Mr. Schnebly was asked whether he recalled Dr. Baker saying anything about the child's future condition and Mr. Schnebly said no.

While Mr. and Mrs. Schnebly testified they felt assured by the statements of the physicians, they also testified that they were aware of the readings of 39.8 and 40, that they knew brain damage is possible at readings over 20 and severe brain damage occurs at higher levels, and that they were very worried.

After Schneblys saw Dr. Baker, the child continued to cry except for a couple of weeks near Christmas. He did not develop like Schneblys' other children; he was constantly sick, did not sleep, and ran a temperature. Mrs. Schnebly testified, "He didn't respond. He didn't ever look at us like he knew anything."

Following the firecracker incident, Mr. Schnebly suggested to Dr. Irish that the child might be sent to the school for the deaf. Dr. Irish responded that maybe the school would not take him because his mental ability would not be high enough. He suggested they take the child to University Hospitals at Iowa City for evaluation. They did so and in April 1965 the child was thoroughly tested there. Mr. Schnebly testified, "As these tests went along, we learned more of Kelly's disabilities, of his damages, brain damages, the extent they would go and what he would be limited to doing. The doctors never said what his

limits would be. This we would also observe as time went on." After examination, the doctor there stated, according to Mrs. Schnebly, that the child "would always have to have complete care and that the crying spells were brain blackouts, a type of seizure, and that Kelly did not even know he was crying; he wasn't in pain or anything, he just didn't have—he just didn't know it; and he said we could give him phenobarbital if we wanted to, but that it wouldn't do him any good. It would only put him out so he'd sleep so we could sleep for a little while, and he thought that these seizures would become worse and he said that we couldn't take care of him and he said that we should go and see the social department about placement, but I told him, 'No, I didn't care to.'" The doctor referred Schneblys to the school for severely handicapped children, which gave Schneblys instruction on attending, feeding, and exercising the child. The matter of placing the child in an institution was discussed but Schneblys were in agreement not to do so.

Thereafter Mrs. Schnebly set up a day-care center in her home, where she attended the child and later other children as well. She employed assistants. Kelly grew some physically but very little mentally. On the basis of the evidence, the trial court described the child thus:

Kelly Schnebly exhibits all of the classical findings of severe kernicterus; namely, profound mental retardation; profound failure of growth and development; profound involvement of the central nervous system, manifested by quadriplegia; profound athetosis [a nervous disorder marked by continual slow movements]; involvement of the teeth due to bilirubin staining and damage; apparent deafness, whether by input without recognition or by true nerve damage; bilateral nerve involvement of both eyes; sixth nerve palsy, bilaterally, preventing voluntary turning to either side; characteristic contractures of the extremities and body; responsiveness limited almost entirely to tactile stimuli; lack of but limited light perception and inability to follow objects visually; and an inability to recognize difference in strangers, possibly recognizing his mother and father only in a primitive way.

The child has regular manual exercises and is diapered every few hours, as he lacks control of elimination. He must be fed and he spits out some food as he cannot control his tongue. He bites his hands and cheeks, makes unintelligible sounds, and laughs at random. He cannot change his position, and Mrs. Schnebly holds him upright for a half hour at a time to rest him. As he grows older and larger, he may require male-nurse attendance. He may live out a normal life expectancy.

On April 22, 1966, the child, through Mr. and Mrs. Schnebly as next friends (in division I), and Mr. and Mrs. Schnebly individually (in division II) filed their petition against the Mason City hospital asking damages for negligence in connection with the faulty bilirubin tests. Mr. and Mrs. Schnebly personally swore to the truth of this allegation regarding the child: "He is now and will continue to be permanently disabled and handicapped and completely unable to care for himself; and that because of his invalid and unattractive appearance and inability to coordinate his movements or communicate in any way, he has and will continue to be deprived of all social contacts with his parents, family and friends and all of the spiritual and physical joys. . . . The plaintiffs' son's brain was severely damaged and he will be a helpless invalid the rest of his life, being completely unable to control his physical processes or acquire any knowledge." The child asked a million dollars damages and Schneblys individually asked $500,000.

On July 19, 1967, the same plaintiffs filed an amended and substituted petition in four divisions. Divisions I and II were similar to the original petition but named Drs. Joyce and Potter as additional defendants. Divisions III and IV were against

Dr. Baker for negligence; division III was by the child and division IV was by Mr. and Mrs. Schnebly individually.

In addition to answering the petition, the defendants filed various cross-petitions against each other for indemnity or contribution, including such a cross-petition by Dr. Baker against the hospital and Drs. Joyce and Potter. Various other pleadings were filed, including one by plaintiffs which increased the amounts of their damage claims.

The action was to be tried to a jury. Shortly before trial was to begin, the hospital and Drs. Joyce and Potter settled with plaintiffs. This fact was published in the local newspaper, and Dr. Baker thereupon argued to the trial court that the publicity would prejudice the jury. The parties then agreed to waive a jury, and the case was tried to the court on plaintiffs' claims against Dr. Baker and on Dr. Baker's cross-claims for indemnity or contribution against the hospital and Drs. Joyce and Potter.

At trial, the parties brought out the matters we have related and also introduced substantial expert testimony.

The trial court found that the child sustained damages of $912,124 and that Mr. and Mrs. Schnebly sustained consequential damages of $132,674. The court also found that Dr. Baker was negligent in numerous respects, including his inattention to the child, his failure to establish a regimen for the case, and basically, of course, his unquestioning acceptance of the Mason City laboratory readings in the face of the different Forest City readings and the child's symptoms. This negligence, the court found, was a proximate cause of the child's injuries. The court further found that Drs. Joyce and Potter were negligent, and through them the Mason City hospital was negligent. But the court found that this negligence was not a proximate cause of the injuries, as Dr. Baker's negligence was a superseding cause. The court therefore rendered judgment for plaintiffs

against Dr. Baker for the amounts of damages found and dismissed Dr. Baker's cross-claims against the hospital and Drs. Joyce and Potter. Dr. Baker appealed.

Dr. Baker contends here that he did not receive a fair trial on the whole case. We have examined the record and hold that this contention is not substantiated. Dr. Baker also makes several other contentions, but only the following issues need to be considered. First, was the claim of Mr. and Mrs. Schnebly individually barred by limitations at the time it was filed? Second, was the award of damages to the child excessive? Third, was Dr. Baker's negligence a superseding cause cutting off the causal effect of the negligence of the hospital and Drs. Joyce and Potter? And fourth, if Dr. Baker is entitled to contribution, what apportionment of contribution should we make?

I. *Limitations.* Schneblys filed the amended and substituted petition bringing in Dr. Baker as a defendant more than two years but less than five years after commission of the alleged tort. Under our statute relating to minors and mentally ill persons, the child's claim against Dr. Baker was not barred. Code 1973, § 614.8. Dr. Baker pleaded, however, that the claim of Mr. and Mrs. Schnebly individually was barred by lapse of time. On this plea, two questions must be considered: (a) What was the statutory period of limitation applicable to the consequential damage claim of Mr. and Mrs. Schnebly for care and loss of earnings of the child during his minority? (b) Did Mr. Baker fraudulently conceal Mr. and Mrs. Schneblys' claim from them?

(a) Our legislature has provided in the following portions of § 614.1 of the Code:

Actions may be brought within the times herein limited, respectively, after their causes accrue, and not afterwards, except when otherwise specially declared: . . .

2. *Injuries to person or reputation —relative rights—statute penalty.*

. . . Those founded on injuries to the person or reputation, including injuries to relative rights, whether based on contract or tort, or for a statute penalty, within two years. . . .

4. *Unwritten contracts—injuries to property—fraud—other actions.* Those founded on unwritten contracts, those brought for injuries to property, or for relief on the ground of fraud in cases heretofore solely cognizable in a court of chancery, and all other actions not otherwise provided for in this respect, within five years. . . .

The issue of the independent nature of consequential damage claims is not involved. See Handeland v. Brown, 216 N.W.2d 574 (Iowa).

■ The question of the statutory limitation period applicable to a person's consequential damage claim resulting from injury or death of another person usually arises in actions by a parent or a spouse, asking for the expense of care and the loss of services of a minor child or of the other spouse. Most courts hold that such consequential damage claims are founded on "injury to the person" of the injured or deceased child or spouse and fall within statutes corresponding to our two-year subsection relating to actions "founded on injuries to the person". § 614.1(2), supra. The actual foundation of the consequential damage claim, without which it would not exist, is the injury or death of the child or spouse. The items recoverable on the consequential damage claim merely measure the damages and do not constitute "the ground or cause of action upon which the suit is founded." Emmert v. Grill, 39 Iowa 690, 693. Some of the numerous decisions so holding are Burstein v. United States Lines Co., 134 F.2d 89 (2 Cir.) (husband's action for injury to wife); Ravetz v. Upjohn Co., 138 F.Supp. 66 (E.D.Pa.) (parents' action arising from defective antibiotic given child); Weaver v. Bahumes, 127 F.Supp. 85, 87 (N.D.Cal.) (husband's action for injury to wife—"Any damages

which must depend directly on someone's personal injuries for their creation and existence are damages both incidental and consequential to the injured person's personal injuries, and they are all in the eyes of the law in the same legal category."); Basler v. Sacramento Electric, Gas & Ry., 166 Cal. 33, 134 P. 993 (husband's action for injuries to wife); Sharkey v. Skilton, 83 Conn. 503, 77 A. 950 (same); Atlantic, V. & W. Ry. v. McDilda, 125 Ga. 468, 54 S.E. 140 (wife's action for death of husband); Hutcherson v. Durden, 113 Ga. 987, 39 S.E. 495 (father's action for seduction of daughter); Mulvey v. Boston, 197 Mass. 178, 83 N.E. 402 (husband's action for injuries to wife); Heavner v. Uniroyal, Inc., 63 N.J. 130, 305 A.2d 412 (follows Rex v. Hutner, infra); Rex v. Hutner, 26 N.J. 489, 140 A.2d 753 (husband's action for injuries to wife—a leading case); Maxson v. Delaware, L. & W. R. R., 112 N.Y. 559, 20 N.E. 544 (husband's action for injuries to wife); Constantinides v. Manhattan Transit Co., 264 App.Div. 147, 34 N.Y.S.2d 600 (father's action for injuries to child); Black v. Eastern Pennsylvania Ry., 257 Pa. 273, 101 A. 644 (husband's action for injuries to wife); Desjourdy v. Mesrobian, 52 R.I. 146, 158 A. 719 (same); Blackwell v. Memphis Street Ry., 124 Tenn. 516, 137 S.W. 486 (mother's action for injuries to daughter); Barker v. Saunders, 116 W.Va. 548, 182 S.E. 289 (mother's action for injuries to infant child). See Annot. 108 A.L.R. 525.

A few decisions are contra. Illinois intermediate appellate courts have held that such consequential damage actions are not for personal injuries, since the early case of Waller v. Chicago, 11 Ill.App. 209. See however Hockett v. American Airlines, Inc., 357 F.Supp. 1343, 1347 n. 7 (N.D.Ill.) (stating that the principle announced by the New Jersey court in Rex v. Hutner, supra, is "a more logical rule"). The New Jersey court formerly held as Illinois appellate courts hold. Fryer v. Mount Holly Water Co., 87 N.J.L. 57, 93 A. 679. But the Fryer case was overruled in Rex v.

Hutner, supra, 26 N.J. 489, 140 A.2d 753. The New York court also formerly took the position of the Illinois appellate courts, Groth v. Washburn, 34 Hun 509, but that case was overruled by the holding in Maxson v. Delaware, L. & W. R. R., supra, 112 N.Y. 559, 20 N.E. 544.

The statutes of limitation in some states use the words "bodily injuries" rather than "personal injuries." A few jurisdictions hold that the term "bodily injuries" is less comprehensive than "personal injuries" and does not cover consequential damage claims. Cliff v. Seligman & Latz, 38 F.2d 179 (6 Cir.) (applying Ohio law); Corpman v. Boyer, 171 Ohio St. 233, 169 N.E. 2d 14. Indiana apparently follows the rationale of the Ohio decisions. Graf v. City Transit Co., 220 Ind. 249, 41 N.E.2d 941. In Massachusetts this result is reached in motor vehicle cases as the implied legislative intent found in a compulsory insurance statute. Cormier v. Hudson, 284 Mass. 231, 187 N.E. 625, applied in Bartlett v. Hall, 288 Mass. 532, 193 N.E. 360. In line with most courts, however, the Massachusetts court holds that the words "injuries to the person" in its general statute of limitations cover consequential damages. Mulvey v. Boston, supra, 197 Mass. 178, 83 N.E. 402.

The Iowa decisions are in accord with the rule prevailing in most states. Subsections 1 and 3 of § 2740 of the Revision of 1860 contained the substance of subsections 2 and 4 of § 614.1 of the present Code which we have quoted (except the words "including injuries to relative rights" in the present statute). In 1867 a husband and father sued for his damages arising from the death of his wife and child, in the case of Sherman v. Western Stage Co., 22 Iowa 556. This court held the action was founded on "injuries to the person" in subsection 1 of the 1860 Revision (now subsection 2), and that the two-year period therefore applied. The court considered subsections 1 and 3 of the 1860 Revision and stated at page 557:

When we construe these in the light of each other, one referring generally to the rights of persons and personal injuries, and the other to rights under contracts and injuries to property, we are brought naturally and fairly to the conclusion, that the suit at bar comes within the spirit and scope of the former rather than of the latter clause of the section.

The court followed the Sherman case in Emmert v. Grill, 39 Iowa 690. Section 2740(1) of the Revision of 1860 was then § 2529(1) of the Code of 1873. In Emmert a wife sued for her damages arising from injuries to her husband resulting from the sale of liquor to him by the defendant. This court held the two-year period applied and stated at pages 692–693:

The case of Sherman v. The Western Stage Co., supra, holds that the foundation of the action in such cases is the personal injury to the individual who is killed. . . .

When we apply these principles to the case before us, we find that, although the statute gives to the wife or child a right of action against the person who causes the intoxication of the husband or father, by intoxicating liquors sold to him in violation of law, yet the foundation of the action is the wrongful act of the defendant in causing the intoxication of the husband or father, which is a personal injury to him. . . .

It is true that the second section of the [dramshop] statute (chapter 47, Laws of 1862) provides that the wife, etc., may recover damages for injuries to her means of support, person or property, caused by any intoxicated person, etc., but this is only for the purpose of measuring the damages, and does not constitute such injuries the ground or cause of action upon which the suit is founded.

The legislature reenacted the entire statute of limitations in the 1897 Code. Evidently for the purpose of codifying the

rule of Sherman and Emmert, the legislature added to the two-year subsection the words, "including injuries to relative rights," causing the subsection to read, "Those founded on injuries to the person or reputation, including injuries to relative rights, whether based on contract or tort, or for a statute penalty, within two years. . . ." Code 1897, § 3447(3) (now § 614.-1(2)). In 1903 a case arose in which a wife sued for her damages arising from the death of her husband caused by defendant's sale of liquor to him. O'Banion v. De Garmo, 121 Iowa 139, 96 N.W. 739. This court construed "injuries to relative rights" to cover the wife's consequential damages and applied the two-year period. The court stated at page 141, 96 N.W. at 740:

> It is also well to remember that the foundation of the action is the sale of the intoxicating liquors, and the consequent intoxication of the husband, occasioning damages to plaintiff. The intoxication was the direct injury resulting from the wrongful act of selling the liquor to the person drinking it, and such injury is the cause of action. That to the wife is wholly consequential. Emmert v. Grill, 39 Iowa, 690. Paragraph 3, § 3447, of the Code [now § 614.1(2)], expressly limits the period within which actions may be maintained therefor to two years: "Those founded on injuries to the person or reputation, including injuries to relative rights, whether based on contract or tort, or for a statute penalty within two years." *This suit is based on an injury to the relative rights of the wife. . . .* (Italics added.)

The question of the applicable limitation period next arose in Palmer v. Cedar Rapids, 165 Iowa 595, 146 N.W. 827. There a father sued for his consequential damages arising from injuries to his minor son caused by a defective sidewalk. In addition to the present two-year provision for personal injuries, the statute at that time provided a six-month limitation for personal injuries arising from defective streets.

On the question of which of those two provisions applied, the court held the six-month provision applicable since the injury resulted from a defective sidewalk. The court was clear however that the father's consequential damages were founded on the son's personal injuries, saying at page 601, 146 N.W. at 829:

> That the foundation of plaintiff's right of action was injury to the son is so clear that no authority need be cited in support of the proposition. But see Sherman v. Western Stage Co., 22 Iowa, 556; Emmert v. Grill, 39 Iowa, 690.

Subsequently this court confirmed its holding in O'Banion that "relative rights" cover consequential damages to a plaintiff arising from injuries to another. Chase v. Winterset, 203 Iowa 1361, 1363, 214 N.W. 591, 592 ("We need not attempt a comprehensive definition of relative rights, but they include such as may arise out of the relationship of husband and wife, master and servant, guardian and ward, and similar relationships.").

We recently considered the question again in Clark v. Figge, 181 N.W.2d 211, 214–215 (Iowa). We held that the phrase "including injuries to relative rights" covers harm *related* to injuries to the person or reputation, under the two-year provision. We stated:

> In substance the phrase means "rights relative to injuries to the person or reputation." Cf. Hartford Accident & Indem. Co. v. W. S. Dickey Clay Mfg. Co., 26 Del.Ch. 411, 24 A.2d 315. The history of the subsection bears out this view. Previously the subsection, so far as material here, spoke only of injuries to the person or reputation. Code 1873, § 2529(1). In a dramshop case arising under that subsection, a wife sought recovery of her damages resulting from injuries to her husband which were brought about by defendant's selling him liquor, and this court held the wife's damages were so related to the husband's personal injuries as to be barred in two years.

Emmert v. Grill, 39 Iowa 690. When the Code of 1897 was subsequently enacted, the legislature added the words "including injuries to relative rights" after the words "injuries to the person or reputation." Code 1897, § 2447(3). Thereafter this court applied the Emmert rule on the basis of "relative rights" in another dramshop case. O'Banion v. De Garmo, 121 Iowa 139, 96 N.W. 739.

Thus § 614.1(2) of the present Code, so far as we are concerned with it here, covers defamation, torts causing bodily injury or death, and harm related to those wrongs.

This review of the authorities makes plain that most courts hold actions for consequential damages arising from the injury or death of another to be for "personal injuries" under statutes similar to our two-year provision in § 614.1(2), that this court so held in the early cases, that the legislature codified such holding by adding "including injuries to relative rights" to the two-year subsection, and that the period of limitation applicable to Mr. and Mrs. Schneblys' claim is therefore two years.

(b) Did Dr. Baker fraudulently conceal Mr. and Mrs. Schneblys' claim from them? They pleaded that he fraudulently concealed the nature of the child's *condition* until the time was too late for them to sue within the period of limitations. They appear however to have retreated from this position by stating in their brief that "they subsequently learned in 1965 and early in 1966 that he had suffered brain damage"—the two years expired in June 1966.

In this court Schneblys claim that Dr. Baker fraudulently concealed or failed to divulge his *negligence* until it was revealed in a subsequent discovery deposition of Dr. Irish.

The issue of whether Mr. and Mrs. Schneblys' claim is barred requires consideration of the application of the statute of limitations in medical malpractice. See Annots. 74 A.L.R. 1317, 144 A.L.R.

209, 80 A.L.R.2d 368. The general rule in tort cases is that the period of limitation commences when the tort is committed. 51 Am.Jr.2d Limitation of Actions § 146 at 715; 54 C.J.S. Limitations of Actions § 205 at 216. To this rule, however, two exceptions have developed in the medical malpractice field, both founded on the unawareness of the plaintiff of his injury or of its cause. Neither exception is approved by all courts. One exception is predicated on fraud: when the physician fraudulently conceals the injury or its cause or, knowing the facts as to the injury or cause, fraudently fails to disclose them, the period does not begin to run until the plaintiff discovers or in the exercise of due care should discover the injury or the cause of it. Underlying this exception is the close relationship of trust and confidence between patient and physician. A majority of decisions which consider the question approve this exception. E. g. Tabor v. Clifton, 63 Ga.App. 768, 12 S.E.2d 137 (surgeon, employed for appendectomy, secretly withheld fact he also removed right tube and ovary); Thompson v. Barnard, 142 S.W.2d 238, 241 (Tex.Civ.App.) ("If the respective doctors knew at the time and continuously after the incision was closed that gauze sponges had been negligently permitted to remain in the patient's abdomen, and continued to treat her for fifteen days thereafter and then discharged her as sufficiently recovered from the operation to return to her home without disclosing such situation and without suggestion or advice as to further treatment, it would seem that such facts were pertinent in determining whether a fraudulent concealment had begun."); Acton v. Morrison, 62 Ariz. 139, 155 P.2d 782 (dentist did not tell patient he left broken portion of drill in jaw but fraudulently stated patient would have no trouble); Moses v. Miller, 202 Okl. 605, 216 P.2d 979 (surgeon falsely stated he removed gall bladder); Hinkle v. Hargens, 76 S.D. 520, 81 N.W.2d 888 (surgeon fraudulently concealed fact he left surgical needle embedded in patient's back); Baker v. Hendrix,

126 W.Va. 37, 27 S.E.2d 275 (surgeon fraudulently concealed fact of sponge in patient's body). We adverted approvingly to the fraudulent concealment exception in Gruener v. City of Cedar Falls, 189 N.W. 2d 577 (Iowa). We hold it is part of the Iowa law, whether the fraud is in concealing or in failing to disclose, as an application of the general fraudulent concealment doctrine. See Pride v. Peterson, 173 N.W. 2d 549 (Iowa).

The other exception, known as the discovery rule and accepted by fewer courts, goes a step farther. Under this exception and apart from fraudulent concealment or nondisclosure by the physician, when the injury or its cause is "inherently unknowable" the period of limitation does not commence until the plaintiff discovers or in the exercise of reasonable care should discover the injury or cause. 61 Am.Jur.2d Physicians & Surgeons § 183 at 310. E. g. Toal v. United States, 306 F.Supp. 1063 (D.Conn.) (plaintiff did not know radioopaque material, injected in spinal myelogram, traveled to his brain); Dobbins v. Clifford, 39 A.D.2d 1, 330 N.Y.S.2d 743 (plaintiff unaware that pancreas damaged during operation on spleen); Ruth v. Dight, 75 Wash.2d 660, 453 P.2d 631 (plaintiff ignorant of foreign article left in body after surgery). We approved the discovery rule for negligence actions generally in Chrischilles v. Griswold, 260 Iowa 453, 463, 150 N.W.2d 94, 100 (plaintiff unaware of defective design until water dripped through ceiling—"We now believe the better rule to be that a cause of action based on negligence does not accrue until plaintiff has in fact discovered that he has suffered injury or by the exercise of reasonable diligence should have discovered it and are persuaded the rationale of the discovery doctrine should be adopted.") See Bryant v. Rankin, 332 F.Supp. 319 (S.D. Iowa). The discovery exception also is therefore a part of Iowa law.

■ Schneblys' difficulty, however, is with the foundation fact for the two exceptions—unawareness of the injury or of what caused it. Decisions holding the statute of limitations did not run involve situations in which the patient did not know the facts. Indeed, the two exceptions themselves contain this qualification—the statute does not run while the plaintiff is blamelessly unaware of what happened. Brown v. United States, 353 F.2d 578 (9 Cir.); Winkler v. Southern California Permanente Medical Group, 141 Cal.App.2d 738, 297 P.2d 728; Hemingway v. Waxler, 128 Cal.App.2d 68, 274 P.2d 699; Bathke v. Rahn, 46 Cal.App.2d 694, 116 P.2d 640; Buck v. Mouradian, 100 So.2d 70 (Fla. App.); Mills v. Warner, 201 Ill.App. 258; Tabolsky v. Crandon, 259 Mass. 32, 155 N.E. 657; Kroll v. Vanden Berg, 336 Mich. 306, 57 N.W.2d 897; Wilder v. St. Joseph Hospital, 225 Miss. 42, 82 So.2d 651; Hays v. Hall, 477 S.W.2d 402 (Tex.Civ.App.). We ourselves have held that "a person cannot claim concealment, of course, if he has knowledge," and, "That plaintiff may have been unaware of the details of the evidence to support her claim does not change the result." Gruener v. City of Cedar Falls, 189 N.W.2d 577, 581 (Iowa). See also Ogg v. Robb, 181 Iowa 145, 162 N.W. 217.

The facts here, from the testimony of Schneblys themselves, are that they were not only aware the child was injured but also knew Dr. Baker persisted in relying on the Mason City bilirubin readings in the face of the contrary Forest City readings and the child's worsening condition.

As to the child's injury, Schneblys were intimately familiar with his condition throughout. From the first days they knew of the bilirubin levels of 39 and 40 and of the lethal effects of such levels. In the hospital the child appeared to Mrs. Schnebly like one of those refugees with that dead lost look. Although born on June 8, he was not released to them until July 9. He cried continually. Schneblys were worried about brain damage. Mr. Schnebly confirmed the child's deafness in the firecracker incident.

The child vomited when fed. Dr. Irish unsuccessfully tried various medicines. Schneblys took the child to Dr. Baker, who prescribed Atarax. Regarding brain damage, Dr. Baker said it would be ten years before they would know and then they would not know the extent. Thereafter the child continued to cry except for a couple weeks. Mrs. Schnebly testified the child never did look at them like he knew anything.

Schneblys took the child to Iowa City. A doctor explained that the child would always require complete care and that his spells were brain blackouts, seizures. He referred Schneblys to the school for severely handicapped. Schneblys refused institutionalization. Mrs. Schnebly set up day care for the child and other handicapped children. Within the limitation period Schneblys commenced action against the hospital alleging that the child's brain was severely damaged. According to their own testimony, Schneblys knew the basic operative facts about the injury.

As to Dr. Baker's negligence, this is not a case of a patient who is unaware of the medical problem or of the acts of the physician. Schneblys regularly kept each other informed; they were aware of the Rh incompatibility problem and its implications; Dr. Irish explained, according to Mrs. Schnebly, that with a bilirubin level of 20 to 25 there would most certainly be some brain damage, from 25 to 30 there would be serious damage, and from 30 to 50 the child usually went into a coma or died; he informed Mrs. Schnebly of the child's initial level of bilirubin; he told her of its level of nine the next morning (June 9) and that this was fast rise; Mrs. Schnebly was worried about the wait before they would take the child to Mason City; that afternoon Dr. Irish told Mrs. Schnebly the level had risen to 13.6 and she observed the child was yellow and less active; that evening Mrs. Schnebly "just knew" something was wrong, the child did not eat, and Dr. Irish told her the level was 17; the next morning (June 10) the child appeared worse to Mrs. Schnebly and was taken to Mason City, and Dr. Irish reported back to Mrs. Schnebly that the test there was 11; that evening Mr. Schnebly saw the jaundiced condition of the child while at Mason City; the next day (June 11) Dr. Irish reported to Mrs. Schnebly that the Mason City test was 9.9 and that Dr. Baker was going to rely on it; that day Mr. Schnebly got the child, who looked "like a Chinaman" and did not appear well at all, and Dr. Baker told Mr. Schnebly that the baby was very jaundiced and quite rigid "but we are going to rely on the test"; that afternoon Dr. Irish reported the 39.8 Forest City reading to Mrs. Schnebly, and they discussed what could be done and Mrs. Schnebly mentioned Rochester; the next morning (June 12) the child was worse, Mrs. Schnebly was "about out of her mind with worry," and Dr. Irish took the child back to Mason City; after a test of 17 there, the faulty reagent was discovered and a reading of 40 was obtained; Dr. Irish returned, explained this to Mrs. Schnebly, and told her Dr. Baker was not going to do anything after the test of 17 until Dr. Irish "ranted and raved and raised the roof."

Under Schneblys' testimony about Dr. Baker's role, they knew the basic operative facts and could make the most of them. We think Dr. Baker did not have to tell Schneblys, before the statute of limitations would run, that he was negligent and that they had a cause of action against him.

This is not a case in which a plaintiff is unaware. Schneblys' individual claim was barred by limitations.

II. *Excessive Damages?* Since Schneblys' own damage claim is barred, we consider only the damage award to the child. The trial court granted the child these damages: $385,440 for care and therapy after he becomes of age, $226,684 for loss of earning capacity after becoming of age, and $300,000 for injuries to the person, pain and suffering, and total disability.

■ This court stated four grounds for setting aside verdicts for excessiveness in *Schmitt v. Jenkins Truck Lines, Inc.*, 170 N.W.2d 632, 659 (Iowa):

> In fact a verdict will not be set aside or altered unless it is, (1) flagrantly excessive or inadequate; or (2) so out of reason as to shock the conscience or sense of justice; or (3) raises a presumption that it is the result of passion, prejudice or other ulterior motive; or (4) is lacking in evidential support.

We may add that a damage award may also be set aside, of course, if the wrong measure is applied. 66 C.J.S. New Trial § 44 at 145 nn. 35, 37.

For reasons which will appear, we think Dr. Baker cannot successfully contend that grounds 1, 2, or 3 exist, nor do we understand he contends they exist. He does contend, however that the child's award (a) lacks evidential support and (b) does not reflect the proper measure.

■ (a) After examining the proofs, we cannot say that the child's award lacks evidentiary support. We cannot do better than to quote the trial court's findings in this connection. After describing the child in the language we have previously quoted, the trial court made these statements which are supported by the evidence:

> Consequently, a requirement of continuous and unbroken total care exists at all times and hours. He has had and receives good care; without it he would have severe contractures of his arms and legs, and he will have contractures in the future unless he is given daily regimen of prescribed and regular therapeutic exercises by manipulation of his limbs. For his good health the therapy must be continued for the remainder of his life. Preventing contractures, apart from his appearance, is concerned with the ease with which he can be handled, moved about, placed in a chair and handled and fed, all of which are rendered easier. It's not expected this child will ever tolerate an upright standing position because of an atonic neck reflex. Also as the child gains in weight and size along with age his problems will be compounded; those of bathing, feeding and moving him within and out of the home; his size will eventually eliminate his mother from lifting and handling him and may require male nursing attendance. Dr. Dunphy [a witness] did not believe there would be a problem in terms of sexual attractions because of his low sensory input, but he pointed up that it is a potential problem. He could eventually and at times require more than one attendant, family or other. Dr. Dunphy also pointed out that the mother, for her own as well as her family's and even Kelly's welfare, "not be left totally to the care of this child without relief and relief she can trust and anticipate results from, such as the day-care program that this child is receiving." All of this adds up, Dr. Dunphy testifies, with reasonable medical certainty to a permanent and total condition for the rest of his life, "ad infinitum; forever," and total and continuing care every hour of every day for the same period of time. . . .

> His mouth tends to be open frequently. Regular manual exercises are administered to him by the nurses at the day-care center where he is daily from 8:00 A.M. to 4:00 P.M. He is diapered every few hours and lacks control of natural functions. Nor is Kelly able to fend for himself in the matter of eating. He has to be spoon-fed by attendants. It is complicated by his lack of tongue control. When his mouth opens to receive food his tongue is thrust out causing part of each mouthful to be ejected from within the mouth with only part swallowed. He chokes and gags on solid foods tolerating only strained, soft and blended foods. Juices and liquids are also partly swallowed and partly spit out as taken. His meals, at four hour intervals, and each take up half an hour of time. He frequently works his jaws in a biting mo-

tion so that his teeth are ground to the gum line. During the first three years of his life he would bite his hands and evidently the more it hurt the harder he bit. They would have to be forcibly removed. He makes audible but unintelligible sounds. He also laughs at times when he is playing and sometimes at random. He sleeps quite well, needing attention ordinarily but once or twice at night. He is unable to change positions while he sleeps so his mother usually holds him upright for half an hour to rest him. At the time of trial he weighed twenty-one pounds, having gained three pounds the last three years.

It is needless at this point to say that Kelly's injuries are catastrophic. Born perfectly healthy with an avoidable condition, defendant's negligence has inflicted upon him a life-long disaster of the greatest possible magnitude. Any normal enjoyment by Kelly Schnebly of the existing order of things, has been completely overthrown.

He will never be able to develop a capacity for work. As he is a member of a family of at least high average achievers, it is within the range of reasonable anticipation to believe Kelly, as a normal child and adult, would have achieved and entered the labor force with at least the equivalent of a high school education.

Plaintiff has established the damages herein by a preponderance of the evidence. The evidence of damages includes that of Charles E. Marberry, Professor of Finance, the College of Business Administration of the University of Iowa, which the Court adopts as reasonable. . . .

[H]is loss of earning capacity through ages twenty-one to twenty-four are determined to be $12,864; ages twenty-five to thirty-four, $91,010; ages thirty-five to forty-four, $98,080; and, ages forty-five to fifty-three, $80,730; resulting in gross earnings lost, ages twenty-one through sixty-three [sic] years, of $282,684, less estimated income taxes of $56,000, or, net earnings of $226,684, lost.

. . .

His care and necessary therapy, limited to his waking, or sixteen hours a day, must be reasonably estimated to have been in the past and continue to be in the future $2 an hour, which times sixteen hours, times three hundred sixty-five days, times thirty-three adult years, ages twenty-one through fifty-three, totals $385,440 for such care and therapy.

. . .

Kelly Schnebly's damages for injuries to his person, pain and suffering and total disability cannot be measured in quite the way other damages herein have been ascertained. Death damages are not involved here, but it can be persuasively contended that the devastation dealt by death is not greater but is less than that we find here. These damages are found to be in the reasonable sum of no less than $300,000.

■ The evidence contains support in specific dollar amounts for the awards for care and therapy and for loss of earning capacity. No evidence in monetary amounts was adduced for the court's allowance of $300,000 for injuries to the person, pain and suffering, and total disability, but such items are incapable of pecuniary measurement by witnesses and must be left to the sound judgment of the fact-finder, based on the evidence. Carradus v. Lange, 203 N.W.2d 565 (Iowa); Jackson v. Chicago, M., St. P. & P. Ry., 238 Iowa 1253, 30 N.W.2d 97.

■ Was an allowance for pain and suffering warranted by the evidence here? "Pain and suffering" is of course an item of damages in itself. 22 Am.Jur.2d Damages § 105 at 155, § 106 at 155; 25 C.J.S. Damages § 62 at 812, § 63 at 815. Both past and future pain and suffering are involved here. While the child's mentality is greatly reduced and the question is close, we believe that under the evidence the

fact-finder could reasonably find that the child does consciously experience pain, at least on great environmental stimulation. See Frankel v. Heym, 466 F.2d 1226 (3 Cir.); Tinnerholm v. Parke, Davis & Co., 411 F.2d 48 (2 Cir.). The award of $300,000 was not for the pain and suffering item alone, and Dr. Baker did not ask to have the findings enlarged to show the sum allowed for that item itself. See rule 179(b), Rules of Civil Procedure. We cannot say that the evidence does not support an award of $300,000 for the items of injuries to the person, pain and suffering, and total disability, altogether.

We hold that the amounts allowed totaling $912,124 are supported by substantial evidence. Actually, Dr. Baker's objection is to rules of law which allow such damages, rather than to lack of evidentiary support for the amounts awarded.

(b) Two of Dr. Baker's arguments regarding the proper measure of damages require consideration. One relates to the possible overlap in the awards of $226,684 and $300,000. The first of these was for loss of earning capacity and the second was for injuries to the person, pain and suffering, and total disability. We may place the matter of pain and suffering aside, as no overlap would exist as to that. Was there an overlap between the award of $226,684 for loss of earning capacity and the portion of $300,000 which was for injuries to the person and total disability?

In tort cases for personal injuries, impairment of future earning capacity is a distinct item of damage. Carradus v. Lange, 203 N.W.2d 565 (Iowa); 22 Am. Jur.2d Damages § 89 at 130; 25A C.J.S. Damages § 185(6) at 230. Such impairment "is to be measured by the present value of the loss or impairment of general earning capacity, rather than loss of wages or earnings in a specific occupation." Grant v. Thomas, 254 Iowa 581, 585, 118 N.W.2d 545, 548. In determining the amount of loss, the fact-finder may consider evidence of wages and earnings, as the trial court did here. Anthes v. Anthes, 258 Iowa 260, 139 N.W.2d 201.

Another item of damage recognized by the law is for disability of mind and body, impairment of physical functions, and deprivation of mental powers. See e. g. Yance v. Hoskins, 225 Iowa 1108, 281 N.W. 489 (disability of arm); Smithson v. Mommsen, 224 Iowa 307, 276 N.W. 47 (back disability). See also 22 Am.Jur. 2d Damages § 118 at 170, § 120 at 171; 25A C.J.S. Damages § 185(4) at 224. This item is for the deprivation of full mind and body, separate and apart from impairment of earning capacity. It is for this item that the trial court apparently allowed damages when it made an award for "injuries to the person" and "total disability."

In finding the amount of loss for such physical or mental disability, the fact-finder must of course avoid duplication of damages for impairment of earning capacity. Overlapping of damages is not permitted. 25 C.J.S. Damages § 3 at 630. See 22 Am.Jur.2d Damages § 352 at 458. Were this a jury case without an instruction on avoiding duplication of such damages, we would have a different problem. But the parties tried this case to the court, and our close reading of the court's findings leads us to conclude that the court did not allow anything for impairment of earning capacity in its allowance for injuries to the person and total disability.

Dr. Baker's other argument regarding the measure of damages has to do with ascertaining the present value of allowances for future damages. Most of the child's damages will occur in the future. The items for care and therapy and loss of earning capacity are wholly for the period after the child becomes of age. The item for injuries to the person, pain and suffering, and total disability is for past and future damages—past as to the period from the tort to the trial and future for the period thereafter.

The trial court did not mathematically discount future damages back to the present. The process applied by the trial court may be illustrated by the award for care and therapy beginning when the child attains his majority. Based on the evidence, the trial court found the present cost for care of the child to be two dollars per hour. Multiplying that rate by the hours of the child's life after he becomes of age yielded $385,440. But based on the testimony of the witness Charles E. Marberry, the trial court found that the rate for care of the child will increase in future years because of increasing price levels and that the rate of increase will approximately equal the rate of return on money. Hence, the court held, the increase and the return offset each other and the child is entitled to the full $385,440 now.

Dr. Baker argues, on the other hand, that at 6% interest, $385,440 received now will increase to $923,718, subject to income taxes, by the time the child becomes of age, to say nothing of the subsequent period during the child's life expectancy. He argues similarly as to the awards of $300,000 and $226,684—the latter, for example, increasing at 6% to approximately $3,400,000 during the child's expectancy of life.

This process of offsetting discount by anticipated inflation (if shown by the evidence) would change the system we have generally followed to this time. With the item of future care and treatment, as an illustration, we have to this time generally ascertained the total cost for the future period, based on present prices, and then discounted that cost back to present value. The "present value" rule has been adhered to by this court as to future damages. E. g. Grant v. Thomas, 254 Iowa 581, 118 N. W.2d 545 (with reference to impaired earning ability); Wardlow v. City of Keokuk, 190 N.W.2d 439 (Iowa) (with reference to wrongful death). See 22 Am.Jur. 2d Damages § 96 at 140; 25A C.J.S. Damages § 194 at 259 ("An allowance for future damages must be reduced to its present value").

While this court and a number of other courts have held that *past* inflation may be considered in comparing present verdicts with previous ones, fewer courts have dealt with the question of *future* inflation. Most of the courts which have done so have held that future damages are to be ascertained on the basis of present price levels—meaning in a case like this one that anticipated higher future prices cannot be used to offset the earning power of money paid presently. Compare Frankel v. Heym, 466 F.2d 1226 (3 Cir.); Murphy v. Eaton, Yale & Towne, Inc., 444 F.2d 317 (6 Cir.); In re Petition of U. S. Steel Corp., 436 F. 2d 1256 (6 Cir.); Williams v. United States, 435 F.2d 804 (1 Cir.); Sleeman v. Chesapeake & O. Ry., 414 F.2d 305 (6 Cir.); McWeeney v. New York, N. H. & H. R. R., 282 F.2d 34 (2 Cir.); Armentrout v. Virginian Ry., 72 F.Supp. 997 (S.D.W.Va.), rev'd on other grounds, 166 F.2d 400 (4 Cir.); Raines v. New York C. R. R., 129 Ill. App.2d 294, 263 N.E.2d 895; Zaninovich v. American Airlines, Inc., 26 A.D.2d 155, 271 N.Y.S.2d 866, with Southern Pacific Co. v. Zehnle, 163 F.2d 453 (9 Cir.); Brooks v. United States, 273 F.Supp. 619 (D.S.C.); Beaulieu v. Elliott, 434 P.2d 665 (Alaska). The principal argument for allowing consideration of future inflation is that an upward price movement is probable and that valuing future damages in terms of present prices does not fully compensate the victim. The principal opposing argument is that future inflation or deflation is speculative, and that the injured person can in any event invest his recovery in equities such as land and thus have the benefit of both inflation and the income.

We in Iowa appear to have crossed the Rubicon on this issue in Schmitt v. Jenkins Truck Lines, Inc., 170 N.W.2d 632 (Iowa). One of the issues there was Schmitt's future earnings had he lived. Professor Marberry, the same witness as here, prepared an exhibit 14 which showed future

earnings with inflation and increased productivity of the economy in the future taken into consideration. He then discounted such higher earnings to a present value of $307,469—as contrasted to $141,586 present value for Schmitt's future earnings without considering future inflation and increased productivity. Four members of this court approved the use of exhibit 14. One judge took no part in the case. The remaining four dissented, but not on this legal issue. Judge Stuart stated for the dissenters that Professor Marberry's assumption of a 7% advance for most years was incorrect but "I do not disapprove of the use of projected income. . . ." He also said, "I believe there was adequate foundation for the opinion that inflation would cause a 4% increase in salary per year in this particular position." 170 N.W.2d at 667.

The judges appear to have agreed, therefore, that future inflation may be considered if shown by the evidence. Future inflation was shown by the evidence here, and the evidence further showed that the inflation rate and discount rate would offset each other. In Schmitt, Professor Marberry increased the future damages by the rate of inflation and reduced such increased future damages by the discount rate. Here he testified that such process was unnecessary since the two rates were a standoff. Under the two opinions in the Schmitt case and the evidence in the present case, the process adopted by the trial court was permissible.

We hold the damages awarded the child are not excessive.

■■■■ III. *Superseding Cause*. The question of superseding cause arises under Dr. Baker's cross-petition for indemnity or contribution. Under the circumstances here, he could not have indemnity, for he himself was negligent. But on his cross-claim for contribution Dr. Baker established, and the trial court found, that the hospital and Drs. Joyce and Potter were negligent—we will call the negligence of those three "the laboratory's negligence."

The amount of damage was also established. To have contribution, Dr. Baker needed only to establish that the laboratory's negligence was a concurring legal cause of the damage. Plaintiffs alleged in their pleadings which were in effect before they settled with the hospital and Drs. Joyce and Potter that the negligences of the several defendants concurred. We would have expected such a fact-finding, as the wrong bilirubin readings from the Mason City laboratory triggered this whole tragedy and wrong readings were forthcoming from the laboratory down to the final afternoon. But the trial court found that the negligence of Dr. Baker during approximately the last 24 hours superseded the laboratory's negligence. Essentially, our problem here is to determine whether the evidence will support that finding.

■■■■ We first consider Dr. Baker's contention that superseding cause was not pleaded, that the trial court in effect injected unpleaded last clear chance. We think this contention takes a too narrow view of superseding cause. Dr. Baker was obliged to allege and prove that the laboratory's negligence was a proximate cause of the damage. Allied Mut. Cas. Co. v. Long, 252 Iowa 829, 107 N.W.2d 682. For conduct to be a proximate cause, two factors must exist: the conduct must be a substantial factor in producing the damage and no rule of law must exist which relieves the actor from liability because of the manner in which the damage resulted. Restatement, Torts 2d, § 431. One such "rule of law" is superseding cause. Id., Comment d ("These rules are stated in §§ 435–461."); § 440 (superseding cause). When Dr. Baker alleged proximate cause he thus alleged both of these factors, and under their denials the hospital and Drs. Joyce and Potter could dispute either or both factors. We hold that superseding cause was in the case as an integral part of the issue of proximate cause. See Doser v. Interstate Power Co., 173 N.W.2d 556 (Iowa); Schmitt v. Jenkins Truck Lines, Inc., 170 N.W.2d 632 (Iowa).

■ Did Dr. Baker's negligence cut off the causal effect of the laboratory's negligence? This court has frequently cited and applied the proximate cause rules as restated by the American Law Institute. E. g. Pose v. Roosevelt Hotel Co., 208 N. W.2d 19 (Iowa) (§ 431); Daly v. Illinois Central R. R., 248 Iowa 758, 80 N.W.2d 335 (§ 432); Calkins v. Sandven, 256 Iowa 682, 129 N.W.2d 1 (§ 434); Federated Mut. Implement & Hardware Ins. Co. v. Dunkelberger, 172 N.W.2d 137 (Iowa) (§ 435). Those rules speak in terms of "legal" cause rather than traditional proximate cause. Restatement, Torts 2d, § 430. If an actor's conduct *is not* a substantial factor in bringing about damage, such conduct is not a legal cause and that ends the inquiry. § 431(a). But if an actor's conduct is a substantial factor in bringing about damage but conduct or forces later occur which the law considers to supersede the actor's conduct, then also the actor's conduct is not a legal cause—"A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." § 440.

■ Intervening conduct or forces may or may not cut off liability for the actor's prior conduct. In a given case, the actor's conduct (the laboratory's negligence) and the intervening conduct (Dr. Baker's negligence) may be regarded as concurring legal causes, § 439, while under other circumstances the intervening conduct or forces may be found to be a superseding cause which terminates the actor's liability for the original conduct. § 440.

The trial court apparently believed that the laboratory's negligence was a substantial factor in bringing about the damage, and he could hardly have found otherwise as the wrong readings from the laboratory set the forces in motion for the ultimate result. But the court held that the child's irreversible brain damage occurred during the last approximate 24 hours before the transfusion, that near the beginning of the 24-hour period Dr. Baker was informed of the 39.8 bilirubin reading, that he had been informed of the previous discrepancies between the Forest City and Mason City readings, that when he saw the child he must have observed the clinical signs of the advancing disease, that he obstinately accepted the Mason City readings over those of Forest City, that his conduct in so doing was not normal and was extremely negligent, that he did not take immediate action but let crucial hours pass during which the child sustained irreversible brain damage, and that such conduct by him constituted a superseding cause overriding the laboratory's negligence.

Under particular facts intervening conduct may be so manifestly superseding in nature as to cut off liability for prior negligence as a matter of law or, on the other extreme, may fail as a matter of law to constitute a superseding cause. Between the extremes are the cases in which the question is one of fact. Brewer v. Johnson, 247 Iowa 483, 72 N.W.2d 556; Restatement, Torts 2d, § 453, Comments b and c; 57 Am.Jur.2d Negligence § 198 at 569; 65A C.J.S. Negligence § 264 at 926–927.

■ Various considerations which are important, although not necessarily controlling per se, in determining whether intervening conduct is or is not a superseding cause are listed in § 442 of the Restatement of Torts 2d. Considerations (e) and (f) are particularly relevant here:

(e) [T]he fact that the intervening force is due to an act of a third person which is wrongful toward the other [the child] and as such subjects the third person to liability to him;

(f) [T]he degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

Section 447 expands on considerations (e) and (f) in situations, such as we have

here, in which the intervening act or omission is a negligent one. The section is couched in the negative, but we believe the reverse may also be relevant. The section states among other things that an intervening negligent act *is not* a superseding cause if "the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent." § 447(c). By the same token, that an intervening act is not a normal consequence and is extraordinarily negligent tends to show that it *is* a superseding cause.

The first time the child was brought to the hospital, Dr. Baker accepted the Mason City bilirubin reading over the Forest City reading. He may then have been negligent. Had the child sustained irreversible damage at that time, the Mason City laboratory would have been hard put to show that Dr. Baker's conduct was not a normal consequence or was extraordinarily negligent. But the evidence sustains the trial court's finding that the irreversible damage did not occur until the last 24 hours, after Dr. Baker had more information but nonetheless adhered to the Mason City laboratory readings. The trial court found that this subsequent conduct of Dr. Baker was not a normal response to the conduct of the laboratory and was so negligent that it cut off the laboratory's negligence. Under the facts, we think that finding cannot stand.

The situation here is considerably different from the usual one in which an actor asserts that negligence subsequent to his own constitutes a superseding cause. In the usual case the actor negligently creates a condition and takes no further affirmative action. Someone else later negligently commits an act and a third person becomes injured. A good illustration is Fishburn v. Burlington & N. W. Ry., 127 Iowa 483, 103 N.W. 481. There a railway negligently constructed a fence which subsequently fell down. Later some children propped it up. The fence thereafter fell

again injuring the plaintiff. The railway asserted that the subsequent propping up was a superseding cause. Such is a typical case involving the superseding cause question.

Here, however, on the basis of the undisputed evidence, we have several distinguishing factors. One is that the original actor, the Mason City laboratory, in fact intended that its reports should be relied on. This is not so in the usual case. Here the very purpose of the laboratory's reports was guidance to physicians. Dr. Baker did the very thing the laboratory expected he would do with reports; he relied on them. Second, the force of the laboratory's negligent acts continued by repetition down to the last. This again is not the usual case. The laboratory did not merely set the stage by one report on the first day, the force of which dissipated as later reports came in from Forest City and the clinical signs worsened. The laboratory negligently kept submitting wrong reports and Dr. Baker negligently kept relying on them. The two negligences were operating concurrently. Still a third aspect not usually present is the critical nature of the laboratory's work. The laboratory was not building fence. Its function constituted a vital part of the diagnostic and therapeutic process on which a child's life depended. The laboratory played a major role in the process, tending to increase its responsibility for the ultimate result. A fourth factor not generally present is the extent of the laboratory's negligence. This was not an isolated fluke in a single test. The reagent had deteriorated over a period of time. For this patient alone the laboratory ran not one but several faulty tests. The test results were not merely erroneous to a degree; they were completely wrong. The extent of the laboratory's culpability tends to extend the causal effect of its negligence. Fifth, Dr. Baker was dealing with laboratory reports from a small rural laboratory manned by a medical technologist and with reports from a large, well-equipped laboratory under the supervi-

sion of two pathologists. The written contract between the pathologists and the hospital recites that the hospital will provide "equipment, customary utilities, laundry service, materials and supplies and personnel necessary to insure the proper operation of the pathology department." The contract contains the covenant, "In all matters in connection with this contract, the welfare and interest of the patient shall always be considered paramount, and particularly as to these phases, namely (1) a constant endeavor to improve the care given to the patient; and (2) under no circumstance shall there be any decrease in the quality of the care rendered the patient." But now we have the contention of those pathologists, hired to run the laboratory because of their expertise, that their fellow medical doctor's preference for their reports was both extraordinarily negligent and abnormal—or, in the words of the Institute, "altogether unusual." Restatement, Torts 2d, § 447. Comment e.

Putting these factors together, it simply cannot be said that Dr. Baker's negligence superseded the laboratory's negligence. Dr. Baker, the Mason City hospital, and the pathologists were all in this medical fiasco together. We hold that Dr. Baker's negligence was not a superseding cause. He is entitled to contribution from the hospital and the pathologists.

■■ IV. *Apportionment of Contribution.* How do we apportion contribution? Ordinarily the total amount of the judgment is divided equally among those liable to the injured person. See 18 Am. Jur.2d Contribution §§ 56 at 83, 61 at 92; 18 C.J.S. Contribution § 6 at 10. We have four such persons or legal entities here: Dr. Baker, the Mason City hospital, Dr. Joyce, and Dr. Potter.

But two complications exist. One is that the trial court held the hospital to be vicariously liable and the other is that Drs. Joyce and Potter operated the laboratory together.

As to the first complication, after finding Drs. Joyce and Potter negligent the trial court found the Mason City hospital negligent "vicariously through them." Since that finding is unchallenged, we accept it. As a result of the finding, an exception to the rule of equality applies. When a person is vicariously liable, that person and the tortfeasor whose negligence is imputed to him are considered together for contribution purposes. Reese v. Henke, 286 Minn. 145, 174 N.W.2d 690; Zeglen v. Minkiewicz, 12 N.Y.2d 497, 240 N.Y.S.2d 965, 191 N.E.2d 450; Martindale v. Griffin, 233 App.Div. 510, 253 N.Y.S. 578, aff'd 259 N.Y. 530, 182 N.E. 167; Parker v. Rodgers, 125 Pa.Super. 48, 189 A. 693; Wait v. Pierce, 191 Wis. 202, 209 N.W. 475, on reh. 210 N.W. 822; Restatement, Torts 2d, Tentative Draft No. 16, § 886A, Comment h ("There will, however, be situations in which equitable principles will call for a different [than equal] distribution. Thus if B is the servant of C, or an independent contractor, and C has become liable only vicariously for the tort of B, it may be proper to hold B and C together for one-half share of the total liability, rather than one-third each."). The result is that the vicariously-liable hospital is considered with the pathologists and not separately.

As to the second complication, Dr. Baker contends Dr. Joyce and Dr. Potter each had a duty to see that procedures were established and followed which assured a fresh reagent, that each breached the duty, and that each is therefore liable for a separate portion of contribution. We think, however, that those two pathologists come within another exception in which several persons together violate a common responsibility—here, to establish and enforce a proper laboratory procedure. Wold v. Grozalsky, 277 N.Y. 364, 14 N.E.2d 437 (three defendants negligent in fall of flowerpot from common wall between two buildings; one defendant owned one building and other two defendants owned other building; contribution in halves rather

than thirds). See also Ramirez v. Redevelopment Agency of San Francisco, 4 Cal.App.3d 397, 84 Cal.Rptr. 356; Bundy v. New York, 23 A.D.2d 392, 261 N.Y.S.2d 221; Marymount College v. John J. Abramsen Co., 6 Misc.2d 836, 161 N.Y.S.2d 920; Eastern States Petroleum Co. v. Texas & N. O. R. R., 114 S.W.2d 408 (Tex.Civ. App.); Restatement, Torts 2d, Tentative Draft No. 16, § 886A, Comment h ("Again, if the plaintiff suffers harm through the fall of a party wall between two lots, one of which is owned by A, and the other by B, C and D in common, it may be proper to hold B, C and D together liable for one-half, rather than one-quarter each."). Suppose here the partnership consisted of nine pathologists instead of two. Under an equal division, Dr. Baker would pay only one-tenth. We hold that Drs. Joyce and Potter are to be considered together for contribution purposes, for failing to fulfill their common responsibility. We do not intimate what the result would be if those two pathologists had actually committed separate negligent acts which concurred with each other and with Dr. Baker's negligence to cause the injury.

The result is that the hospital and the pathologists are liable to contribute one-half. Dr. Baker bears the other half; under the contribution rules, that is his equitable portion.

While Dr. Baker is entitled to judgment now against the hospital and the pathologists for contribution, execution is not to issue on that judgment until Dr. Baker has discharged more than his equitable portion of the child's judgment and then only for the amount that he pays in excess of his equitable portion. Falciani v. Philadelphia Transp. Co., 189 F.Supp. 203 (E.D.Pa.) (conditional judgment); Wait v. Pierce, 191 Wis. 202, 209 N.W. 475, on reh. 210 N.W. 822 (contingent judgment). We use the words "equitable portion" rather than a specific dollar amount because we do not know how the child's judgment will be paid or discharged and because the parties have not presented before us, nor

do we decide, the effect of any settlement payments which were made by the hospital or the pathologists. When Dr. Baker does become entitled to execution, he can collect his judgment from one, some, or all of the three: the hospital, Dr. Joyce, and Dr. Potter. Palmer v. Stacy, 44 Iowa 340; Benjamin v. Faro, 1 A.D.2d 948, 150 N.Y. S.2d 620. What if any rights of indemnity or contribution the hospital, Dr. Joyce, and Dr. Potter may or will have inter se we do not consider.

On the whole case, we have carefully considered the numerous other arguments presented, but they do not change the result.

We sustain the judgment for the child but dismiss the claim of Mr. and Mrs. Schnebly. We award judgment for contribution in favor of Dr. Baker and against the Mason City hospital and the pathologists. We tax the costs one-half to Dr. Baker and one-half to the Mason City hospital and the pathologists, but we limit costs for appellees-Schneblys' brief to $2 per page. Finally we return the case to district court for entry of judgment.

Affirmed in part, reversed in part, and remanded.

MOORE, C. J., and RAWLINGS, REYNOLDSON, HARRIS and McCORMICK, JJ., concur.

LeGRAND and REES, JJ., dissent from Division IV.

MASON, J., takes no part.

LeGRAND, Justice (dissenting from Division IV on apportionment of contribution).

I concur in the judgment for plaintiff and in all of the majority opinion except Division IV dealing with the manner in which contribution is apportioned among the defendants.

The majority finds Dr. Baker, the hospital, and the two pathologists all guilty of negligence which proximately caused the overwhelming damages which followed. The opinion then orders the judgment be paid one-half by Dr. Baker and one-half jointly by the hospital and the two pathologists. This is the part of the opinion with which I cannot agree.

I have no quarrel with treating the two pathologists as a single entity for purposes of contribution but I dispute the finding which associates the hospital with them for that purpose. The result, of course, is that contribution is distributed in halves rather than thirds and the further result is that Dr. Baker—unfairly—is required to pay one-half of the total judgment rather than one-third, which I think would be the correct assessment.

The majority does this on the theory the hospital's negligence is vicarious, arising only because of its relationship with the pathologists, who committed the negligent acts upon which liability depends. In the first place, I cannot accept this under the record before us. In reversing the trial court on its finding that Dr. Baker's negligence was a superseding cause, the majority held against the other defendants on the issue of proximate cause *as a matter of law*. The record demands that same conclusion as to the hospital's independent negligence in furnishing a totally unreliable reagent solution—the real trigger for all that followed.

Even assuming the majority is correct, however, in concluding the hospital's liability is vicarious only, I would apportion contribution equally among Dr. Baker, the hospital, and the pathologists, leaving the matter of contribution between the hospital and the pathologists for determination by later appropriate action.

I refute the rationale by which one of three negligent parties is penalized because the other two bear some relationship to each other entirely separate and distinct from his involvement. Why should this penalize Dr. Baker, whose negligence under the majority's findings is of the same order as that of the other defendants? It is interesting to note, too, that the majority reaches a result on contribution which none of the parties requests or argues. The only matter presented on this appeal is whether contribution should be in thirds or in fourths. In other words, should the two pathologists be assessed singly or together? No one contends contribution should be in halves. That is an issue which the majority has gratuitously advanced in this case.

I think this is a wrong result, particularly in view of the majority's claim that contribution should be determined on equitable principles. Yet the decision is singularly inequitable. It is grossly unfair to one defendant and unjustifiably preferential to the others.

As already mentioned, I agree with the judgment in favor of plaintiff. My disagreement goes only to what is a fair adjustment among the defendants who must pay plaintiff's damages.

I would modify the majority opinion to provide for contribution one-third by Dr. Baker, one-third by the hospital, and one-third jointly by the two pathologists. In all other respects I concur.

REES, J., joins in this dissent.