972 F.2d 354
 NOTICE: Eighth Circuit Rule 28A(k) governs citation of unpublished opinions and provides that they are not precedent and generally should not be cited unless relevant to establishing the doctrines of res judicata, collateral estoppel, the law of the case, or if the opinion has persuasive value on a material issue and no published opinion would serve as well.
Randolph W. JONES, Appellant,
v.
IOWA CENTRAL COMMUNITY COLLEGE; Dennis Pilcher, Appellees.
 No. 91-3265.
 United States Court of Appeals,
Eighth Circuit.
 Submitted: March 26, 1992.
Filed: July 9, 1992.
 
 Before FAGG, BOWMAN, and BEAM, Circuit Judges.
 PER CURIAM.
 
 
 1
 This diversity case arises from a motor vehicle accident. Dennis Pilcher, the Iowa Central Community College basketball coach, was driving a college van bringing players home from a tournament. While the van was stopped or backing up, a truck hit the van from behind. The van's seats broke free from the floor and tilted backwards, pinning the passengers under the seats in front of them. Randolph W. Jones, a former student-athlete with the college and an aspiring professional basketball player, was a passenger in the rear seat of the van. Asserting he suffered injuries in the accident, Jones brought this personal injury action against the college and Pilcher (collectively ICCC). After finding the ICCC negligent, a jury awarded Jones $250,000 for loss of future earning capacity and $20,000 for future pain and suffering. Finding the evidence did not support these awards, the district court granted the ICCC's motion for judgment notwithstanding the verdict (JNOV) and set the awards aside. The district court denied the ICCC's alternative motion for a new trial but only addressed whether the items of damage unaffected by the JNOV were excessive. Jones appeals the district court's order granting JNOV asserting the evidence supported the jury's awards. We agree and reverse. We remand, however, because the district court did not conditionally rule on the ICCC's motion for a new trial with respect to the excessiveness of the damages awarded for loss of future earning capacity and future pain and suffering.
 
 
 2
 When reviewing the propriety of JNOV, we view the evidence in the light most favorable to the nonmoving party. Carper v. State Farm Mut. Ins. Co., 758 F.2d 337, 340 (8th Cir. 1985) (equating Iowa and federal JNOV standards). This requires us to:
 
 
 3
 (1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant [that] the evidence tends to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to [come to different conclusions].
 
 
 4
 Id. Thus, a motion for JNOV should be granted " ' "only if the evidence points all one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party." ' " St. Paul Fire & Marine Ins. Co. v. Salvador Beauty College, Inc., 930 F.2d 1329, 1332 (8th Cir. 1991) (applying Iowa law in diversity case) (quoted cases omitted). Reviewing the record in the light most favorable to Jones, we believe the evidence supports the jury's awards.
 
 
 5
 Immediately after the accident, Jones was shaken up but did not think he was injured. The next morning, however, Jones went to a hospital emergency room because his entire body was sore. (Tr. at 76-77.) Jones eventually went to several medical practitioners. Dr. Baker, Jones's medical expert, gave deposition testimony that was admitted at trial. (Tr. at 526-27.) Jones complained of knee and back pain and swelling in his right knee whenever he was active. (Baker Dep. at 66.) He had never been injured or had any problems with his knees or back before the accident. (Tr. at 81-82.) Dr. Baker observed swelling in Jones's right knee during his first examination of Jones in October 1989. (Baker Dep. at 19.) Based on a physical examination and Jones's medical records, Dr. Baker gave his opinion that as a result of the accident, Jones suffers from chondromalacia patella (bad cartilage on the surface of the kneecap) and lumbosacral (lower back) strain. (Baker Dep. at 36-37.) Jones's back may never heal and he may have chronic pain. (Baker Dep. at 56.)
 
 
 6
 While in high school in Syracuse, New York, Jones received All-American basketball honors and was heavily recruited by major universities. Jones performed well enough in high school and on the Scholastic Aptitude Test that he was not a proposition 48 player. (Tr. at 23, 148-49.) Ten colleges offered Jones full scholarships. (Tr. at 19.) He eventually accepted a full basketball scholarship at Southern Methodist University (SMU). During his second semester at SMU, however, he lost his eligibility to play N.C.A.A. Division I basketball because of his grades. (Tr. at 33.) Jones then attended Kilgore Junior College near SMU on a full basketball scholarship. (Tr. at 43-44.) Jones lost his scholarship at Kilgore because of poor grades. (Tr. at 44-46.) Jones next attended Iowa Central. He did not receive a scholarship and was serious about regaining his academic eligibility to play Division I basketball. (Tr. at 50-51.) Although he started the semester four weeks late, Jones regularly attended his classes-all physical education courses selected by Pilcher except one-and was receiving no D's or F's up to the date of the accident towards the end of the semester. (Tr. at 53, 58.) After the accident, however, Jones's relationship with Pilcher and his other professors became cold. (Tr. at 102.) Because of this atmosphere and his injuries, Jones quit attending his classes. (Tr. at 106). Jones flunked all his courses at Iowa Central and returned to his parents' home in Syracuse. Before attending Iowa Central, Jones had never received less than a Bk in any physical education course. (Tr. at 47.)
 
 
 7
 When Jones returned to Syracuse in May 1987, he had no work experience. (Tr. at 110.) Jones got a job that paid $8.50 per hour unloading trucks for United Parcel Service, (Tr. at 110), but worked only three weeks because his body could not handle the bending and lifting, (Tr. at 116). In February 1988 Jones got a factory job paying $10.00 per hour, but lost the job after a month because his injuries prevented him from performing the required lifting. (Tr. at 120.) Jones then decided to try playing basketball again. In July 1988 Jones went to the Pro. Am. basketball tournament hoping to interest a professional basketball scout. (Tr. at 122-23). After the first three or four games, however, Jones's body became tired, his knees swelled, and he was in so much pain that he did not want to play anymore. (Tr. at 125.) Thus, Jones quit.
 
 
 8
 When Jones returned from the Pro. Am. tournament, his knees swelled for a while. (Tr. at 127-28.) Jones began a desk job as a telemarketer for a Syracuse newspaper earning about $7.00 per hour. (Tr. at 128.) In the spring of 1990, Jones tried playing semiprofessional football for no pay because he wanted to do something athletic. (Tr. at 132-33.) Jones apparently kept his telemarketing job, which he still held at the time of trial. Jones believed his injuries might not bother him so much in football because the sport does not require participants to run continuously for forty minutes or jump up and down. Jones, however, experienced pain while playing football and soon abandoned the sport when he seriously injured his right knee in a game. (Tr. at 133.) Jones had surgery on the knee. When Dr. Baker reexamined Jones in June 1990 after his football injury, Jones's back had improved, but Jones still had intermittent symptoms. (Baker Dep. at 70.) Dr. Baker reaffirmed his earlier opinion.
 
 
 9
 At trial in April 1991, Jones testified he still experienced knee pain and back fatigue, (Tr. at 134), his injuries have never stopped bothering him, (Tr. at 120), he has "always had the pain" (Tr. at 132), and he believes his injuries are permanent (Tr. at 104). Jones, however, could not identify any knee pain specifically associated with the accident because he could not tell the difference between pain from the accident and pain from the football injury. (Tr. at 134.) Jones's father, a minister, testified his son has changed since the accident. The injuries have made Jones short tempered, depressed, and less active. (Tr. at 524-25.) Jones's mother also testified that after the accident, Jones's right knee swelled whenever he tried to run or do any real activity, (Tr. at 497), and that the swelling continued up to the time of his football injury in 1990, (Tr. at 498).
 
 
 10
 Based on observing Jones play basketball in high school, assistant coach Wayne Morgan of the Syracuse University basketball team testified about Jones's ability to play professional basketball. Morgan testified that if Jones had played college basketball for four years (at a combination of junior and four-year colleges) without getting hurt, Jones could have played professional basketball in Europe. (Tr. at 224-25.) According to Morgan, Jones could have earned $75,000 a year for ten years. (Tr. at 213.)
 
 
 11
 Under Iowa law, impairment of future earning capacity is a distinct item of damage. Holmquist v. Volkswagen of Am., 261 N.W.2d 516, 525 (Iowa Ct. App. 1977); see Schnebly v. Baker, 217 N.W.2d 708, 726 (Iowa 1974) (comparing damages for impairment of future earning capacity with damages for future loss of full mind and body). Impairment is measured by the loss or impairment of general earning capacity, rather than loss of wages or earnings in a specific occupation. Holmquist, 261 N.W.2d at 525. Medical testimony is admissible but not always essential to support damages for loss of future earning capacity. Id. Impairment of physical capacity creates an inference of lessened earning ability in the future. Id.
 
 
 12
 The district court found the evidence was insufficient to support the jury's award for loss of future earning capacity because the court believed there was no evidence that Jones would have regained his academic eligibility to play college basketball. Without regaining academic eligibility, Jones could not get the experience playing college basketball that he needed to be selected by a professional team. Thus, according to the district court, no reasonable jury could find Jones's professional basketball career was taken away by the van accident.
 
 
 13
 We believe the record supports submission of Jones's loss of future earning capacity to the jury. In our view, a reasonable juror could find Jones's accident-related injuries continue to bother him and limit his capacity to perform physical tasks, whether the task is playing basketball or lifting at work. A juror could reasonably find Jones cannot play basketball at the level he did before the accident and left two manual labor jobs because he could not physically perform them. From a finding of impaired physical capacity, the jury could infer Jones's future ability to earn is diminished. Id. Thus, Jones's right to damages for impairment of earning capacity was a question for the jury. See Carradus v. Lange, 203 N.W.2d 565, 569 (Iowa 1973) (although plaintiff's doctor testified plaintiff's only injury was a back sprain that within several months would heal and no longer cause her pain, jury issue generated on issue of damages for impairment of earning capacity); Grant v. Thomas, 118 N.W.2d 545, 548 (Iowa 1962) (earning capacity of physical laborer who returned to his pre-injury job after suffering "whiplash" in accident was affected because laborer experienced new pain and stiffness following work). When a plaintiff suffers pain up to the trial date and there is evidence the plaintiff has not fully recovered, the jury can infer future pain and suffering without medical testimony. DeBurkarte v. Louvar, 393 N.W.2d 131, 140 (Iowa 1986); see also Daniels v. Bloomquist, 138 N.W.2d 868, 873 (Iowa 1965).
 
 
 14
 The district court found the evidence did not support the jury's award for future pain and suffering because "[Jones] could [not] specifically identify any pain associated with the accident ... that still remained." In the district court's view, the only evidence supporting the award was Jones's testimony that his back gets tired when he runs or plays ball. The district court held that as a matter of law, this statement is insufficient evidence of future pain and suffering.
 
 
 15
 Viewing the evidence in the light most favorable to Jones, we conclude a reasonable jury could find Jones had not fully recovered from his injuries at the time of trial. Jones testified about his recurring back and knee pain, and others testified they saw objective symptoms of Jones's injuries between 1987 and 1990, namely, knee swelling. Thus, the jury could infer Jones would experience future physical pain and suffering as a result of his injuries. See Carradus, 203 N.W.2d at 569 (jury issue on future pain and suffering generated when at time of trial, plaintiff experienced pain with some related restrictions on her ability to engage in normal employment). The jury could also infer Jones would experience future mental pain and suffering. See Holmquist, 261 N.W.2d at 525-26 (pain and suffering is not confined to physical aches).
 
 
 16
 In sum, we cannot say the evidence is susceptible of no reasonable inferences supporting Jones's position. We thus reverse the district court's order granting JNOV on the issues of loss of future earning capacity and future physical and mental pain and suffering. With respect to these items of damage, however, the district court failed to rule conditionally on the ICCC's alternative motion for a new trial as Federal Rule of Civil Procedure 50(c)(1) requires. Accordingly, we retain jurisdiction and remand this case for the district court to complete its new trial ruling. See Nodak Oil Co. v. Mobil Oil Corp., 526 F.2d 798, 798-99 (8th Cir. 1975). The district court should certify its ruling to us as promptly as possible. If either party disputes the district court's decision, we will establish a briefing schedule to complete this appeal.